**Slip Op. 05–70**

## UNITED STATES COURT OF INTERNATIONAL TRADE

---

| | |
|---|---|
| HEBEI NEW DONGHUA AMINO ACID CO., LTD., | : |
| | : |
| | : Before: Restani, Chief Judge |
| Plaintiff, | : |
| | : Court No. 04–00409 |
| v. | : |
| | : **PUBLIC VERSION** |
| UNITED STATES, | : |
| | : |
| Defendant. | : |

---

[Plaintiff's motion for judgment on the agency record denied; judgment entered for Defendant.]

Dated: June 15, 2005

Hume & Associates PC, (Robert T. Hume) for Plaintiff.

Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (David S. Silverbrand), Barbara J. Tsai, Attorney-Advisor, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for Defendant.

## OPINION

**RESTANI, Chief Judge:**

Plaintiff Hebei New Donghua Amino Acid Co., Ltd. ("New Donghua") challenges the decision of the United States Department of Commerce to rescind its new shipper review of New Donghua as an exporter of glycine into the United States. See Glycine from the People's Republic of China: Notice of Recision of Antidumping Duty New Shipper Review of Hebei New

<u>Donghua Amino Acid Co., Ltd.</u>, 69 Fed. Reg. 47,405 (Dep't Commerce Aug. 5, 2004)

[hereinafter "<u>Recision Notice</u>"].  New Donghua claims that Commerce improperly rejected its

lone U.S. sale as not bona fide, contesting both the statutory basis for Commerce's bona fide

sales analysis and the evidentiary basis for its decision.  Because Commerce's decision was in

accordance with law and supported by substantial evidence, New Donghua's motion for

judgment on the agency record is denied and judgment is entered for Defendant.

### BACKGROUND

On March 29, 1995, Commerce published an antidumping duty order on imports of

glycine from China, which currently imposes an antidumping duty of 155.89 percent on nearly all

Chinese glycine imports to the United States.  <u>See</u> <u>Glycine from the People's Republic of China</u>,

60 Fed. Reg. 16,116 (Dep't Commerce Mar. 29, 1995) (antidumping duty order).[1]

New Donghua's first sale of glycine to a customer in the United States, the sale at issue in

the instant proceeding, entered on February 10, 2003 (referred to hereinafter as the "U.S. sale" or

the "new shipper sale").  Pursuant to 19 U.S.C. § 1675 (a)(2)(B) (2000), and 19 C.F.R. §

351.214(d), New Donghua filed a new shipper review request on March 26, 2003, certifying it

was both an exporter and producer of glycine and did not export glycine to the United States

during the original period of investigation.  Section 1675(a)(2)(B) of title 19 enables a new

shipper "to demonstrate that it should be accorded a dumping rate specific to itself, and not the

'all-others' rate . . . ."  <u>Tianjin Tiancheng Pharm. Co. v. United States</u>, No. 03-00654, Slip Op.

---

[1]  One Chinese exporter, Nantong Dongchang Chemical Industry Corp., has a separate antidumping duty rate of 18.60 percent.  <u>See</u> <u>Glycine from the Peoples [sic] Republic of China</u>, 66 Fed. Reg. 13,284, 13,285 (Mar. 5, 2001) (amended final results of new shipper review).

05-29 at 2 (Ct. Int'l Trade March 9, 2005).

Commerce initiated a new shipper review to determine whether New Donghua was entitled to its own antidumping duty rate and to calculate a weighted average margin for New Donghua. See Notice of Initiation of Antidumping Duty New Shipper Review: Glycine from the People's Republic of China, 68 Fed. Reg. 23,962 (May 6, 2003) [hereinafter "Notice of Initiation"]. The period of review covered sales of glycine by New Donghua from March 1, 2002, through February 28, 2003 (the "POR").

## I.    NEW DONGHUA'S GLYCINE BUSINESS AND THE U.S. SALE

New Donghua began producing glycine in 2000. New Donghua Sections A, C, D Questionnaire Response (July 11, 2003), at A-3, P. R. Doc. 11, C.R. Doc. 2, Pl.'s Conf. App. at tab 1. As reported in its questionnaire responses to Commerce, New Donghua sold a small quantity of glycine to a customer in the United States on January 2, 2003. Id. at Ex. 1.[2] New Donghua describes the U.S. sale as a "test sale" in which the U.S. importer was attempting "to ascertain whether a dumping margin would apply to the sale so it could determine what prices it could sell glycine for in the United States market." Pl.'s Conf. Op. Br. at 4 (citing New Donghua First Supp. Questionnaire Response (Dec. 19, 2003), Supp - 21, C. R. Doc. 5, Pl.'s Conf. App. at tab 3).

---

[2] [

]

## II.    THE PRELIMINARY RESULTS OF THE NEW SHIPPER REVIEW

Commerce issued the preliminary results of the new shipper review on March 2, 2004.

Notice of Preliminary Results of Antidumping Duty New Shipper Review: Glycine from the

People's Republic of China, 69 Fed. Reg. 9,804 (Dep't Commerce Mar. 2, 2004) [hereinafter

"Preliminary Results"].  The Preliminary Results calculated a preliminary dumping margin of

8.89 percent, based in part on adverse inferences made from New Donghua's failure to report

factors of production data to the best of its ability.  Preliminary Results, 69 Fed. Reg. at 9,808.

For the purpose of calculating U.S. price, Commerce made a preliminary finding that New

Donghua's single U.S. sale was bona fide—i.e., not commercially unreasonable—with the

qualification that the bona fide sale issue would be considered further.  Id. at 9,807.

In the memorandum explaining the preliminary bona fide sale finding, Commerce found a

large differential between New Donghua's U.S. sale price and the average unit values ("AUVs")

for U.S. imports of glycine from China over the three-year period from 2001 through November

2003 ($2.54) and U.S. glycine imports from all countries ($2.67).  Mem. from Matthew Renkey

to Barbara E. Tillman Re: Bona Fide Nature of the Sale in the New Shipper Review of Hebei

New Donghua Amino Acid Co., Ltd. at 3 (Dep't Commerce Feb. 24, 2004) [hereinafter

"Preliminary Bona Fides Memo"].  Commerce declined to make a preliminary not bona fide

finding on the basis of these price comparisons, explaining that New Donghua's U.S. sale was

for food grade glycine while the comparison AUVs did not differentiate among the different

grades of glycine.  See id.

Commerce remained concerned about the bona fide nature of the sale, however.  It

viewed the large price differential between the new shipper sale and the comparison AUVs as

"significant." Id. Commerce noted "that the quantity of New Donghua's sale is low in comparison with other entries of glycine from the PRC, and is also low in comparison with the quantities of its other international sales to third country markets." Id. Commerce also remained "concerned about the fact that this merchandise has not been resold by the importer." Id.

III.    **THE RECISION OF THE NEW SHIPPER REVIEW**

Ultimately, Commerce did not adopt the preliminary position it took in the Preliminary Results and Preliminary Bona Fides Memo. Instead, Commerce rescinded the new shipper review on August 5, 2004, citing three factors as leading to the conclusion that "New Donghua's single sale to the United States is not a bona fide commercial transaction":

A)    the pricing of the sale is artificially high and otherwise commercially unreasonable;
B)    the quantity of the single shipment is extremely low in comparison with other sales from the People's Republic of China (PRC); and
C)    the importer has not resold the merchandise and has otherwise not acted in a commercially reasonable manner.

Mem. re: Bona Fides Analysis for Hebei New Donghua Amino Acid Co., Ltd.'s Sale in the New Shipper Review of Glycine from the People's Republic of China at 5 (Dep't Commerce July 23, 2004), Pl.'s Conf. App., Ex. 7 [hereinafter "Final Bona Fides Memo"]; see also Recision Notice, 69 Fed. Reg. 47,405.

Commerce explained its decision not to maintain a bona fide sale finding on the ground that the price differential "could not reasonably be accounted for solely by the difference between food and industrial grade glycine." Final Bona Fides Memo at 13. In reaching its conclusion as to price, Commerce compared New Donghua's U.S. sale price to (1) the weighted AUV of all Chinese glycine entries during the POR that were of the types covered by the antidumping duty

order and not clearly aberrational, based on proprietary data in the United States Customs &

Border Protection ("CBP") database;[3] (2) the weighted AUV of all Chinese imports of glycine

during the POR based on public import statistics; and (3) the weighted AUV of U.S. imports of

glycine from all countries during the POR based on publicly available U.S. import data. Id. at 11

(citing Preliminary Bona Fides Memo at 2 and attachments 2, 3). In reaching its conclusion as to

quantity, Commerce compared New Donghua's U.S. sale quantity to quantities it sold to other

markets during the POR and quantities of entries made by other Chinese glycine exporters during

the POR. Final Bona Fides Memo at 16. In reaching its conclusion regarding the actions of the

U.S. importer, Commerce relied on information provided by New Donghua. Id. at 17–18.

## JURISDICTION

New Donghua timely filed a summons challenging Commerce's decision to rescind the

new shipper review on August 13, 2004. New Donghua timely filed its complaint on August 26,

2004. The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a) and 28 U.S.C. 1581(c) (2004).

## STANDARD OF REVIEW

As with other antidumping duty proceedings, the court reviews Commerce's

determinations in new shipper reviews to determine whether they are "unsupported by substantial

evidence on the record, or otherwise not in accordance with law." 19 U.S.C. §1516a(b)(1)(B)(i)

(2000); Tianjin Tiancheng Pharm., Slip Op. 05-29 at 7.

---

[3] [

                                    ]

## DISCUSSION

New Donghua contends that (1) Commerce lacked the authority to determine whether New Donghua's sales of glycine were bona fide, and (2) even if Commerce possessed such authority, Commerce misapplied its bona fide sale test.

**I.     COMMERCE HAS STATUTORY AUTHORITY TO CONDUCT A "TOTALITY OF THE CIRCUMSTANCES" BONA FIDE SALE TEST IN THE COURSE OF A NEW SHIPPER REVIEW**

New Donghua challenges the bona fide sale test conducted by Commerce as an unreasonable interpretation of the statute. According to New Donghua, Commerce's practice is contrary to Congress' intent because, without any direction from the statute, Commerce wields the bone fide sale test like an anti-fraud test, imposing the maximum antidumping duties on new shippers whose transactions are deemed not bona fide. See Pl.'s Conf. Op. Br. at 17. New Donghua also challenges the act as unreasonably vague in its application, with no parameters to indicate in advance how Commerce will treat a sale. See id. at 17–18. Both arguments fail.

**A.     Commerce's Bona Fide Sale Test Is Consistent With Its Statutory Authority**

The court analyzes New Donghua's challenge pursuant to the two-step analysis prescribed by Chevron, U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). The first question is "whether Congress has directly spoken to the precise question at issue." Id. at 842. If so, the court "must give effect to the unambiguously expressed intent of Congress." Id. at 843. If not, the court addresses the second question of whether Commerce's interpretation "is based on a permissible construction of the statute." See id.; see also Koyo Seiko Co. v. United States, 258 F.3d 1340, 1346 (Fed. Cir. 2001).

Under 19 U.S.C. § 1675(a)(2)(B), Commerce is required to conduct periodic

administrative reviews "for new exporters and producers" who submit a properly documented

request for review. See id. These reviews require Commerce to determine the normal value,

export price, and resulting dumping margin for "each entry" of the subject merchandise. See 19

U.S.C. § 1675(a)(2)(A)(i), (ii). Although the term "each entry" seems all-inclusive, this court has

recognized that it does not "compel inclusion of all sales, no matter how distorting or

unrepresentative." American Permac v. United States, 16 C.I.T. 41, 44, 783 F. Supp. 1421, 1424

(1992). Thus, and as New Donghua concedes, the statute does not address specifically the issue

of whether, in the course of reviews for new shippers, Commerce is authorized to determine

whether the new shippers' sales into the United States are bona fide or commercially reasonable.

Pursuant to the second step in the Chevron analysis, the issue, then, is whether Commerce has

engaged in a permissible construction of the latent ambiguity in the statute's use of the term

"each entry." This inquiry is principally to determine whether Commerce's construction was

reasonable. See Fujitsu General Ltd. v. United States, 88 F.3d 1034, 1043 (Fed. Cir. 1996). New

Donghua "bear[s] the burden of showing that the agency's approach is arbitrary or otherwise

unreasonable." Koyo Seiko, 258 F.3d at 1347.

Commerce has articulated the bona fide sale test in the course of its new shipper reviews.

See, e.g., Freshwater Crawfish Tail Meat from the People's Republic of China, 68 Fed. Reg.

1,439, 1,440 (Dep't Commerce Jan. 10, 2003) (notice of final results and recision of new shipper

review); Fresh Garlic from the People's Republic of China, 67 Fed. Reg. 11,283 (Dep't

Commerce Mar. 13, 2002) (final results and recision of new shipper review). Commerce's

reasonable interpretations of its statutory authority in the course of new shipper reviews are

entitled to deference. See Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1382

(Fed. Cir. 2001) ("statutory interpretations articulated by Commerce during its antidumping proceedings are entitled to judicial deference under Chevron.").[4]

Commerce's use of a "totality of the circumstances" bona fide sale test in new shipper reviews constitutes a permissible construction of the statute. The reasonable inference from the statutory term "each entry" is that it does not mandate the use of unrealistic, commercially unreasonable sales prices in the calculation of U.S. price. See Tianjin Tiancheng Pharm., Slip Op. 05-29 at 9 ("[T]he ultimate goal of the new shipper review is to ensure that the U.S. price side of the antidumping calculation is based on a realistic figure . . . ."); see also American Permac, 16 CIT at 42-43, 783 F. Supp. at 1423 ("Fair (apples to apples) comparison is the goal of the price comparisons required by the antidumping laws, as the courts have stated time and again.") (citing U.H.F.C. Co. v. United States, 916 F.2d 689, 697 (Fed. Cir. 1990); Smith-Corona v. United States, 713 F.2d 1568, 1578 (Fed. Cir. 1983); AOC International, Inc. v. United States, 13 CIT 716, 718, 721 F. Supp. 314, 317 (1989)). In accordance with the goal of ensuring a realistic U.S. price figure, it is reasonable that Commerce uses the bona fide sale test to exclude sales that are "not typical of normal commercial transactions in the industry." Tianjin Tiancheng Pharm., Slip Op. 05-29 at 5. Accordingly, the court continues to recognize the bona fide sale test as a valid exercise of Commerce's authority. See, e.g., id., Slip Op. 05-29 at 7; Windmill Int'l Pte., Ltd. v. United States, 193 F. Supp. 2d 1303, 1312 (Ct. Int'l Trade 2002); Am. Silicon Techs. v. United States, 24 CIT 612, 616, 110 F. Supp. 2d 992, 995 (2000).

---

[4] Commerce's regulations for new shipper reviews are set forth in 19 C.F.R. § 351.214. These regulations, like the statute, do not discuss a bona fide sale test. See 19 C.F.R. § 351.214(b)(2)(iv)(C) (mandating only that a request for a new shipper review establish "[t]he date of the first sale to an unaffiliated customer in the United States.").

Apparently conceding a statutory gap, New Donghua argues that Commerce's statutory authority to conduct new shipper reviews is confined to preventing fraud. See Pl.'s Conf. Op. Br. at 20. As New Donghua cites no explicit statutory language to this effect, this argument implies that Commerce's duty to calculate antidumping margins based on "each entry" necessarily excepts fraudulent sales but not sales that are unrepresentative of commercial conduct and extremely distortive. Logic does not dictate such a conclusion. Commerce must calculate a realistic U.S. price so that a fair comparison may be made with normal value, and a commercially unreasonable sale may undermine this objective even if Commerce is unable to determine that such sale resulted from fraud. See Windmill, 193 F. Supp. 2d at 1312. Accordingly, Commerce acts within its statutory authority when it excludes atypical and distortive transactions without establishing the civil or criminal law elements of fraud.

**B.      Commerce's Bona Fide Sale Test Is Not Unreasonably Vague**

Next, New Donghua argues that Commerce's bona fide sale test "is unreasonable because there are no parameters." Pls' Op. Br. at 17. On the contrary, parameters exist. Because the bona fide sale test derives from a seemingly all-inclusive statutory term, Commerce's authority to exclude sales as not bona fide is limited to "exceptional circumstances when those sales are unrepresentative and extremely distortive." Am. Silicon Techs., 24 CIT at 616, 110 F. Supp. 2d at 995 (quoting FAG U.K. Ltd., v. United States, 20 CIT 1277, 1281–82, 945 F. Supp. 260, 265 (1996)); see also FAG U.K., 20 CIT at 1282, 945 F. Supp. at 265 ("In essence, a sale is excluded only when its inclusion would lead to an unrepresentative price comparison, thus frustrating the 'apples to apples' comparison goal of the antidumping laws."). In determining whether a sale is representative of a new shipper's commercial behavior, Commerce applies a "totality of

circumstances" test focusing on whether or not the transaction is "commercially reasonable" or "atypical of normal business practices." Windmill, 193 F. Supp. 2d at 1313; see also Tianjin Tiancheng Pharm., Slip Op. 05-29 at 8. In evaluating whether or not a sale is "commercially reasonable," Commerce has considered the following factors, among others: (1) the timing of the sale, (2) the price and quantity; (3) the expenses arising from the transaction, (4) whether the goods were resold at a profit, (5) and whether the transaction was at an arm's length basis. See Windmill, 193 F.Supp. 2d at 1310; Am. Silicon Techs., 24 CIT at 616, 110 F. Supp. 2d at 995. Commerce's practice makes clear that it is highly likely to examine objective, verifiable factors to ensure that a sale is not being made to circumvent an antidumping duty order. Thus, a prospective new shipper is on notice that it is unlikely to establish the bona fides of a sale merely by claiming to have sold in a manner representative of its future commercial practices.

New Donghua apparently seeks either prospective guidance or "bright-line rules" regarding bona fide sales. Prospective guidance would conflict with the statutory requirement that antidumping duties be calculated on the basis of entries of subject merchandise, see 19 U.S.C. § 1675(a)(2)(A), a requirement reflected in the pertinent Commerce regulation. See 19 C.F.R. § 351.212(a) ("the United States uses a 'retrospective' assessment system under which final liability for antidumping and countervailing duties is determined after merchandise is imported."). Similarly, to the extent that New Donghua seeks "bright-line rules" that would give clearer guidance than already exists, it makes the unreasonable demand that Commerce anticipate every circumstance under which any sale of any type of merchandise would be "unrepresentative and extremely distortive." See Am. Silicon Techs., 24 CIT at 616, 110 F. Supp. 2d at 995. Even if such an enterprise were practicable and not contrary to law, the court doubts that the result

would offer clearer guidance to a particular shipper of a particular good. See Tianjin Tiancheng

Pharm., Slip Op. 05-29 at 32–33.[5]

## II.     COMMERCE PROPERLY APPLIED THE BONA FIDE SALE TEST

New Donghua contends that, even if Commerce had authority to apply a bona fide sale

test considering the totality of the circumstances, Commerce lacked substantial record evidence

to support its determination that New Donghua's sale was not bona fide. As noted above,

Commerce based its determination on three factors: (1) the price was aberrationally high in

comparison with Chinese prices and the world price; (2) the quantity of the sale was extremely

low in comparison with other shipments of glycine from China; and (3) the importer's behavior

was inconsistent with good business practices. See Final Bona Fides Memo at 5-21.

### A.     New Donghua's Sale Price Was Aberrationally High

Commerce determined that New Donghua's sale price was aberrational by comparing the

New Donghua price to (1) the weighted AUV of all covered Chinese glycine entries during the

POR that were not clearly aberrational, based on proprietary data in the CBP database; (2) the

weighted AUV of all Chinese imports of glycine during the POR, based on public import

---

[5] In Tianjin Tiancheng Pharm., the court noted that Commerce's practice is to evaluate the bona fide nature of a sale on a case-by-case basis: "[w]hile some bona fides issues may share commonalities across various Department cases, each one is company-specific and may vary with the facts surrounding each sale." Slip Op. 05-29 at 33 (quoting Issues & Dec. Mem. to Final Results of the Antidumping Duty New Shipper and Administrative Reviews on Certain Preserved Mushrooms for the People's Republic of China - February 1, 2001 through January 31, 2002, (July 11, 2003), available at http://ia.ita.doc.gov/frn/summary/prc/03-17628-1.pdf). The court upheld Commerce's exclusion of a single sale as not bona fide: "Given the unusual sale price involved, it was not unreasonable for Commerce to look beyond the price to determine whether other characteristics of the sale were such as to demonstrate that the sale as a whole, was atypical." Slip Op. 05-29 at 33. Atypical or non-typical in this context means unrepresentative of a normal business practice. See Am. Silicon Techs., 24 CIT at 616, 110 F. Supp. 2d at 995.

statistics; and (3) the weighted AUV of U.S. imports of glycine from all countries during the POR, based on publicly available U.S. import data. Final Bona Fides Mem. at 11.[6] New Donghua's sale price was substantially higher than the three comparison values.[7] These price comparisons constitute substantial evidence for Commerce's conclusion that New Donghua's sale price was "substantially higher than any observed value." Id. at 11.

New Donghua challenges Commerce's findings as to price comparisons on several grounds. First, New Donghua argues that, in establishing a benchmark with the AUV of Chinese glycine prices based on proprietary import data, Commerce improperly excluded as aberrational unit values that were higher than New Donghua's price. New Donghua cites three examples of Chinese glycine sales during the POR in which the unit-values of were higher than New Donghua's price. However, the sales cited by New Donghua pertain to a non-glycine product or a type of glycine not subject to the antidumping duty order. See Rebuttal Brief of Petitioners Dow Chemical Company and Chattem Chemicals, Inc. (June 23, 2004) at 4 n.11, C. R. Doc. 22.

---

[6] [

]

[7] [

]

(hereinafter "Pet'rs Rebuttal Br.").[8] New Donghua does not challenge directly Commerce's

methodology of excluding entries not covered by the antidumping duty order.

Regarding the prices actually used in the comparison, Commerce excluded only one entry

for the POR of the relevant type.[9] This excluded entry exceeded the closest relevant type unit-

value for an entry not originating with New Donghua by over 750 percent, making it an obvious

outlier. Commerce reasonably excluded the sale as aberrational.

Second, New Donghua contends Commerce contradicted itself by finding New

Donghua's price to be artificially high in the bona fides analysis after finding the price to be too

low in the Preliminary Results antidumping duty calculations, wherein Commerce calculated an

dumping margin of 8.89 percent for New Donghua. See Prelim. Results, 69 Fed. Reg. at 9,808.

No contradiction exists, however. The inconsistency identified by New Donghua is based on

mistaken comparisons between two different analyses, each with its own objective. See Tianjin

Tiancheng Pharm., Slip Op. 05-29 at 15 n.7. Commerce performs dumping calculations to

identify and assess duties upon foreign merchandise that is, or is likely to be, "sold in the United

States at less than its fair value." 19 U.S.C. § 1673. Numerous rules apply to dumping margin

calculations that are irrelevant to the bona fide sale analysis. For instance, New Donghua's

preliminary dumping margin was based, in part, upon adverse inferences made from New

Donghua's failure to cooperate to the best of its ability. Prelim. Results, 69 Fed. Reg. at

9,805–06. In contrast, a bona fide sale analysis seeks to exclude those sales designed to appear

---

[8] [
                                        ]

[9] [
     ]

less harmful than sales from other subject producers in the hope of securing a competitive

advantage for the subsequent period of review. This distinction between dumping margin

calculations and bona fide sales analyses was explained in Tianjin Tiancheng Pharm.:

> the combination of a high "all others" rate and the [p]laintiff's high price
> compared to other import prices could mean two things: either [p]laintiff truly
> means to replicate the high price sale upon which it predicated the review, or,
> [p]laintiff will take advantage of one high price sale to secure a
> lower-than-average dumping margin, and then typically charge a far lower price
> (low enough to undercut the competition that has a higher dumping margin, but
> still high enough to make a hefty profit which would otherwise be unavailable).
> Considering that the latter is a far more profitable avenue, and that, because of the
> extended timelines of antidumping reviews, [p]laintiff could have more than two
> years to enjoy an extremely advantageous, and possibly predatory, market position
> predicated entirely on an atypical sale, the weight of the evidence is in
> Commerce's favor in holding that the scenario above is likely indicative of an
> atypical, or non-bona fide, sale. Moreover, given that the dumping margin
> calculation and the bona fide analysis address different concerns, there is nothing
> inherently contradictory in Commerce's finding that a price was low enough to be
> dumped, and yet so high when compared to other prices in the U.S. market as to
> be unlikely to be sustained in the future, especially where the motives for not
> sustaining the price are so clear.

Slip Op. 05-29 at 15 n.7 (citation omitted, emphasis added). If New Donghua's argument were

accepted, a firm intent on unfair competition would be free to manipulate the antidumping duty

regime by selling at a price between normal value and the export prices of other subject firms and

then lowering its price after obtaining an advantageous cash deposit rate. This is not to say that a

new shipper seeking review of a single sale is destined to receive the country-wide rate; price

alone would likely be an insufficient basis on which to exclude a transaction. Rather, the bona

fides analysis encompasses factors beyond price to assess whether the sale(s) under review are

indicative of future commercial behavior. See Final Bona Fides Memo at 4 ("Although single

sales, even those involving small quantities, are not inherently commercially unreasonable, those

factors taken together with other aspects of a transaction may support a conclusion that a

transaction is not bona fide."); see also Issues and Decision Mem.: New Shipper Review of

Clipper Manufacturing Ltd. in Fresh Garlic from the PRC:  Final Results of Administrative

Review and Recision of New Shipper Review, 67 Fed. Reg. 11,283 (Dep't Commerce March 13,

2002) (stating that, in bona fide sales analyses, Commerce examines "a number of factors, all of

which may speak to the commercial realities surrounding an alleged sale of subject

merchandise.").

Third, New Donghua argues that the use of "dumped" Chinese glycine import prices for

comparison purposes is inconsistent with legislative history and precedent.  Pl.'s Conf. Op. Br. at

24–25.  To support its contention, New Donghua cites the conference report on the 1988

amendments to the Tariff Act of 1930, see 1998 U.S.C.A.A.N. 1547, 1623, Omnibus Trade and

Competitiveness Act of 1988, Conf. Rep. to Accompany H.R. 3, H. Report No. 576, as well as

precedent.  See Kerr-McGee Chem. Corp. v. United States, 21 CIT 1353, 1366, 985 F. Supp.

1166, 1177 (1997); Technoimportexport, UCF America, Inc. v. United States, 16 CIT 13, 16–17,

783 F. Supp. 1401, 1405 (1992).  These authorities do not pertain to Commerce's bona fide sales

analyses; they refer to the requirement that Commerce avoid using dumped prices in the

calculation of surrogate factors of production in non-market economy antidumping cases.  As

discussed above, there is no statutory basis for imposing the full spectrum of dumping margin

calculation rules on Commerce's bona fide sale test.  See Final Bona Fides Memo at 12 ("[T]he

question being addressed is not what the U.S. price of glycine should be, but whether the price of

glycine determined by New Donghua for a single sale is an artificial one, arrived at largely for the

purposes of establishing a new cash deposit rate.").

Apparently, New Donghua would prefer its sale be compared with the AUVs of Chinese

glycine that include antidumping duties. This position presumes that AUVs inclusive of dumping duties reflect realities in the U.S. market because all but one of the subject entries for the POR were subject to the same cash deposit rate of 155.59 percent ad valorem. Neither New Donghua's price nor the weighted AUV comparison prices for the POR, however, include the cash deposit paid. If Commerce were to compare the price of New Donghua's sale, which does not include the value of cash deposits paid, with weighted AUV data inclusive of cash deposits paid as a contingent liability, the result would be a distorted comparison of two different data types. Without running afoul of New Donghua's legislative intent argument, Commerce, of course, could add cash deposit values to New Donghua's price and the comparison prices, which would not alter the price differentials.

### B.      The Quantity of the Sale Was Extremely Low

The second factor underlying Commerce's determination is that the quantity of New Donghua's sale was found to be "atypical of the company's normal business practices (its sales to other markets were of significantly larger quantities), as well as the business practices of other Chinese exporters of glycine, which also tend to sell in larger quantities." Final Bona Fides Memo at 16.[10] Substantial record evidence exists for both conclusions.

Some of New Donghua's exports during the POR were made through an affiliate. As

---

[10]  [



]

noted by New Donghua, the affiliate made three glycine shipments during the POR involving small quantities. See Pl.'s Conf. Op. Br. at 28.[11] These quantities contradict the parenthetical statement made in Commerce's conclusion, i.e., that New Donghua's "sales to other markets were of significantly larger quantities," but only if the statement is understood to include individual sales involving New Donghua's affiliate. This apparent contradiction is, by itself, insufficient to deprive Commerce of an evidentiary basis for its conclusion that the U.S. sale's quantity was atypical of New Donghua's normal business practices. As Commerce stated in the Final Bona Fides Memo, the quantity of New Donghua's U.S. sale is "very low when compared to its other international sales of glycine," and the company "made only one shipment to the United States during the POR." Final Bona Fides Memo at 16. New Donghua's affiliate made three shipments to a third country during the POR. Aside from these three shipments, all related individual shipment quantities to other markets were indeed significantly higher than the U.S. sale quantity. See New Donghua Add'l Information for Response to Fourth Supp. Questionnaire at Exs. 3, 4 (May 20, 2004). There is no basis for requiring Commerce to give more weight to an affiliate's behavior than the principal's.

Commerce's conclusion as to the U.S. sale's atypical quantity is also supported by comparisons to other Chinese glycine exporters' quantities. Commerce found New Donghua's U.S. sale quantity to be the "lowest quantity among glycine entries from China during the POR."

---

[11] [

]

Final Bona Fides Memo at 16.[12]  New Donghua identifies three sales from the PRC by other firms involving relatively small quantities, but, similar to its flawed argument regarding price, these quantities do not pertain to types of entries covered by the antidumping duty order.  See id.[13]

### C.     The Actions of New Donghua's U.S. Customer Indicate the Transaction Was Not Commercially Reasonable

Commerce's third basis for rescinding the review was the background and conduct of New Donghua's U.S. customer.  Commerce found that the customer (1) "had no previous experience in the glycine business, nor in the chemicals business in general," (2)  "paid far above the prevailing import price for glycine from China, and also far above the import price for glycine from all markets," (3) held the glycine so long that 75 percent of its 24-month shelf-life had expired, and (4) had no prospects for a sale at the time of Commerce's decision to rescind the review.  Final Bona Fides Memo at 19–20.  New Donghua does not contest these findings. Because these facts suggest that the new shipper sale's only purpose was to secure an advantageous cash deposit rate, they support Commerce's conclusion that the transaction was not conducted in a commercially reasonable manner.

New Donghua challenges Commerce's interpretation of the customer's post-sale behavior, describing as reasonable the customer's "express intention of obtaining the results of

---

[12] [


]

[13] [
]

the new shipper review in order to set a proper resale price." See Pl.'s Conf. Op. Br. at 29 (citing New Donghua First Supp. Questionnaire Response (Dec. 19, 2003), Supp - 20–21, Pl.'s Conf. App. at tab 3). Similarly, New Donghua's general position is that the circumstances of the sale—including price and quantity—are entirely consistent with its position that the U.S. sale was a test sale and should have been evaluated as such. Commerce acknowledged New Donghua's position, but invocation of the term "test sale" does not have a talismanic effect, negating all indications of an atypical transaction. When a purported test sale is under review, Commerce is not obligated to overlook evidence suggesting that the U.S. sale "was made solely for the purpose of establishing a new antidumping deposit rate, without regard to the commercial reasonableness of the sale." See Final Bona Fides Memo at 20. Indeed, the artificial appearance of the U.S. sale is New Donghua's fault:

> In one-sale reviews, there is, as a result of the seller's choice to make only one shipment, little data from which to infer what the shipper's future selling practices would look like. This leaves the door wide to the possibility that the sale may not, in fact, be typical, and that any resulting antidumping duty calculation would be based on unreliable data.

Tianjin Tiancheng Pharm., Slip Op. 05–29 at 38.

New Donghua attempts to support its test sale argument by citing Am. Silicon Techs., which upheld Commerce's decision to conduct a new shipper review on the basis of a test sale. See 24 CIT at 619, 110 F. Supp. 2d at 998. In that case, however, Commerce was presented with verifiable indications of the bona fide nature of the test sale. The seller did not request a review, lessening concerns about the seller's motives for a small, high-priced sale. Id. The buyer was "an end-user of the silicon metal and did not resell the merchandise at a loss." Id. (contrasting the buyer's conduct with the unprofitable sale in Cut-to-Length Carbon Steel Plate from

Romania, 63 Fed. Reg. 47,232 (Dep't Commerce Sept 4, 1998) (notice of recision of review)).

The stated purpose of the test sale—to test the quality of the merchandise—was specific and

germane to the buyer's business, which used the merchandise. See Am. Silicon Techs., 24 CIT

at 619, 110 F. Supp. 2d at 998.

Here, on the other hand, New Donghua made a single sale and then requested the new

shipper review. The U.S. customer is not an end-user and has no previous experience with

glycine or the chemicals business in general. As an aspiring middleman in the glycine business,

it could reasonably be expected to seek a profitable resale. Its declared intention for not selling

the merchandise—to wait for the final results of the review—is generic and consistent with a

desire to obtain a favorable cash deposit rate before lowering prices.

**CONCLUSION**

The court realizes that when there are very high antidumping duty margins, it may be very difficult for any affected company to enter or reenter the U.S. market. Nonetheless, Commerce is not amiss in trying to avoid creating an unfair playing field and seeking evidence of a bit more of a genuine investment as a show of good faith by the new shipper. Otherwise, circumvention is too likely. On the other hand, the standard for what is a non-bona fide sale must remain relatively stringent, as Commerce's bona fide sales analysis merely fills a gap left by Congress with regard to the exceptional case.

Commerce's decision to rescind New Donghua's new shipper review was supported by substantial evidence and in accordance with the law. Accordingly, New Donghua's motion for judgment on the agency record is denied and judgment is entered for Defendant.

IT IS SO ORDERED.

/s/ Jane A. Restani
Jane A. Restani
Chief Judge

Dated:  This 15th day of June, 2005.
        New York, New York