Slip Op. No. 13-61

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| _____ | : | |
| ZHENGZHOU HUACHAO INDUSTRIAL CO., LTD. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | Before: Richard K. Eaton, Judge |
| Defendant, | : | |
| | : | Court No. 11-00139 |
| and | : | |
| | : | Public Version |
| FRESH GARLIC PRODUCERS ASSOCIATION, CHRISTOPHER RANCH, L.L.C., THE GARLIC COMPANY, VALLEY GARLIC, and VESSEY AND COMPANY, INC. | : | |
| | : | |
| Defendant-Intervenors. | : | |
| _____ | : | |

## OPINION

[Plaintiff's motion for judgment on the agency record is denied and the Department of Commerce's final determination rescinding plaintiff's new shipper review is sustained.]

Dated: May 14, 2013

*Mark B. Lehnardt*, Lehnardt & Lehnardt LLC, of Liberty, MO, argued for plaintiff.

*Stephen C. Tosini*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, D.C., argued for defendant. With him on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistant Director. Of counsel on the brief was *George H. Kivork*, Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Washington, D.C.

*Michael J. Coursey*, Kelley Drye & Warren, LLP, of Washington, D.C., argued for defendant-intervenors. With him on the brief was *John M. Herrmann*.

Eaton, Judge:  Before the court is the motion for judgment on the agency record, pursuant to USCIT Rule 56.2, of plaintiff Zhengzhou Huachao Industrial Co., Ltd. ("plaintiff" or "Huachao"), an exporter of fresh, whole garlic from the People's Republic of China ("PRC"). By its motion, Huachao challenges the Department of Commerce's ("Commerce" or the "Department") rescission of its new shipper review under the antidumping duty order on fresh garlic from the PRC following a determination that Huachao's sale into the United States was not bona fide.  *See* Garlic From the PRC, 76 Fed. Reg. 19,322 (Dep't of Commerce Apr. 7, 2011) (rescission of antidumping duty new shipper reviews) ("Rescission"), and the accompanying Final Bona Fides Memorandum (Dep't of Commerce Mar. 31, 2011) ("Bona Fides Mem."); Fresh Garlic From the PRC, 59 Fed. Reg. 59,209 (Dep't of Commerce Nov. 16, 1994) (antidumping duty order) ("Order").  The period of review ("POR") is November 1, 2008 through October 31, 2009.

At center, "Huachao argues that the agency record . . . does not contain substantial evidence to support Commerce's findings that Huachao's sale price, volume, sales transaction, or import information lead to a conclusion that Huachao's sale was not *bona fide*."  Pl.'s Br. in Supp. of Mot. for J. on the Agency R. 3 (ECF Dkt. No. 43) ("Pl.'s Br.").  Defendant United States ("defendant") fully supports Commerce's determination and insists that it "is supported by substantial evidence and is in accordance with law."  Def.'s Mem. in Opp. to Pl.'s Mot. for J. on the Agency R. 1 (ECF Dkt. No. 61) ("Def.'s Mem.").  Defendant argues that "Commerce properly considered the quantity, value, business structure, and payment terms of the transaction, and found that the price of Huachao's sale was unusually [[     ]], the quantity was unusually [[   ]], the business decision of Huachao to process *and* sell its garlic was atypical, and the importer's payment records were inconsistent and incomplete."  Def.'s Mem. 18.

Defendant-intervenors, the Fresh Garlic Producers Association and its individual members (Christopher Ranch, L.L.C., The Garlic Company, Valley Garlic, and Vessey and Company) ("defendant-intervenors"), maintain that plaintiff's contentions are without merit and the court should sustain the determination in its entirety. Def.-Ints.' Resp. in Opp. to Pl.'s Mot. for J. on the Agency R. 1 (ECF Dkt. No. 56) ("Def.-Ints.' Resp."). The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2006) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006).

For the reasons set forth below, plaintiff's motion is denied and defendant's Rescission of Huachao's new shipper review is sustained.

## BACKGROUND

In 1994, Commerce issued an antidumping duty order on imports of fresh garlic from the PRC. Order, 59 Fed. Reg. at 59,209. Huachao did not participate in the underlying antidumping investigation or in any administrative review and, as a new shipper, is subject to the PRC-wide antidumping rate unless it can secure an individual rate through a new shipper review.

Huachao operates as a domestic garlic trader in the PRC.[1] Def.'s Mem. 3. In the summer of 2009, an acquaintance of Huachao's owner discussed its operations with representatives of an unaffiliated U.S. importer. Pl.'s Br. 3. Huachao and the U.S. importer then negotiated a purchase and sale of garlic by telephone and email, eventually leading to an agreement whereby the U.S. importer would import Huachao's garlic into the United States. Pl.'s Br. 3–5. Huachao made a single sale into the United States during the POR, which consisted of [[          ]] kilograms of fresh, whole, unpeeled garlic, with a total value of [[          ]], or an average unit value ("AUV") of [[        ]] per kilogram. Def.'s Mem. 3.

---

[1] The record shows that Huachao has [[   ]] shareholders and [[   ]] permanent employees. Def.'s Mem. 3.

On December 1, 2009, Commerce received Huachao's timely request for a new shipper review. *See* Fresh Garlic from the PRC (Dep't of Commerce Nov. 30, 2009) (request for new shipper review) (P.R. Doc. 3; C.R. Doc. 3). On January 5, 2010, the Department initiated the new shipper reviews for three exporters of fresh garlic from the PRC, including Huachao. Fresh Garlic From the PRC, 75 Fed. Reg. 343 (Dep't of Commerce Jan. 5, 2010) (initiation of new shipper reviews).

On November 12, 2010, Commerce issued its Preliminary Results, finding that Huachao's sale *was* bona fide, and setting its dumping margin at $0.03 per kilogram. *See* Fresh Garlic From the PRC, 75 Fed. Reg. 69,415, 69,417, 69,422 (Dep't of Commerce Nov. 12, 2010) (preliminary results of new shipper reviews and preliminary rescission in part) ("Prelim. Results"), and accompanying Preliminary Bona Fides Analysis Mem. (Dep't of Commerce Nov. 1, 2010) ("Prelim. Bona Fides Mem."). In the Preliminary Results, however, Commerce also stated that "the price and quantity level of [Huachao's] sale causes some concern regarding the bona fide nature of the sale." Prelim. Bona Fides Mem. at 4. Furthermore, Commerce found that "given the concerns regarding . . . [Huachao's] reported price and quantity of its garlic sale, as well as the timing of its customer's payment, [Commerce] plan[ned] to continue to examine all factors relating to the bona fide nature of [Huachao's] sale throughout the remainder of this [new shipper review]." Prelim. Bona Fides Mem. at 6. Commerce then issued a supplemental questionnaire to Huachao and requested briefing from all parties on the bona fides of the company's sale. In their briefing, the domestic petitioners (defendant-intervenors here) challenged the bona fides of Huachao's sale. Def.-Ints.' Resp. 5–7. Additional evidence was placed on the record by both plaintiff and defendant-intervenors. Rescission, 76 Fed. Reg. at 19,322.

On April 7, 2011, Commerce determined that Huachao's sale was not bona fide, and rescinded the new shipper review. Rescission, 76 Fed. Reg. at 19,324. In the Rescission, Commerce found that

> (1) Huachao's sale price is so high as to be commercially unreasonable and not indicative of the garlic industry, (2) Huachao's sales quantity is not commercially reasonable, (3) Huachao's function as the processor of its U.S. sale is atypical of its normal business practice, and (4) there are inconsistencies in the information provided by Huachao's customer in the United States, raising doubts about Huachao's description of the sale's structure.

Rescission, 76 Fed. Reg. at 19,324.

## STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.      Legal Framework

Under 19 U.S.C. § 1675(a)(2)(B), Commerce shall, upon request, conduct administrative reviews "for new exporters and producers." 19 U.S.C. § 1675(a)(2)(B). The purpose of these new shipper reviews is to determine whether exporters or producers, whose sales have not previously been examined, are (1) entitled to their own duty rates under an antidumping order, and (2) if so, to calculate those rates. *See Hebei New Donghua Amino Acid Co. v. United States*, 29 CIT 603, 604, 374 F. Supp. 2d 1333, 1335 (2005). When conducting these new shipper reviews, "[i]t is Commerce's practice . . . to determine whether the new exporters and producers have conducted bona fide or commercially reasonable transactions." *Shandong Chenhe Int'l Trading Co. v. United States*, 34 CIT __, __, Slip Op. 10-129, at 5 (Nov. 22, 2010) (citing 19

C.F.R. § 351.214(b)(2) (2009); *Hebei New Donghua*, 29 CIT at 608, 374 F. Supp. 2d at 1338).

In doing so, "Commerce normally employs a totality of the circumstances test to determine

whether the transaction is 'commercially reasonable' or 'atypical of normal business practices.'"

*Shandong Chenhe*, 34 CIT at __, Slip Op. 10-129, at 6 (quoting *Hebei New Donghua*, 29 CIT at

610, 374 F. Supp. 2d at 1339).

Thus, if Commerce determines, after reviewing all of the circumstances surrounding a

sale, that the sale was not commercially reasonable, and therefore not bona fide, it may rescind

the new shipper review. *See Catfish Farmers of Am. v. United States*, 33 CIT __, __, 641 F.

Supp. 2d 1362, 1368 (2009) ("If the weight of the evidence indicates that a sale is not typical of a

company's normal business practices, the sale is not consistent with good business practices, or

'the transaction has been so artificially structured as to be commercially unreasonable,' the

Department finds that it is not a bona fide commercial transaction and must be excluded from

review." (citation omitted)).

"In evaluating whether or not a sale is 'commercially reasonable,' Commerce has

considered the following factors, among others: (1) the timing of the sale, (2) the price and

quantity[,] (3) the expenses arising from the transaction, (4) whether the goods were resold at a

profit, (5) and whether the transaction was at an arm's length basis." *Hebei New Donghua*, 29

CIT at 610, 374 F. Supp. 2d at 1339 (citing *Windmill Int'l Pte., Ltd. v. United States*, 26 CIT 221,

228, 193 F. Supp. 2d 1303, 1310 (2002); *Am. Silicon Techs. v. United States*, 24 CIT 612, 616,

110 F. Supp. 2d 992, 995 (2000)). When weighing these factors, and others, Commerce's

overarching goal is to determine "whether the sale(s) under review are indicative of future

commercial behavior." *Hebei New Donghua*, 29 CIT at 613, 374 F. Supp. 2d at 1342 (citations

omitted); *see also Shandong Chenhe*, 34 CIT at __, Slip Op. 10-129, at 6; *Tianjin Tiancheng*

*Pharm. Co. v. United States*, 29 CIT 256, 258, 366 F. Supp. 2d 1246, 1249 (2005). For

Commerce, a primary indication that a sale (or series of sales) is not bona fide is evidence that

the sales price is unusually high in comparison to the prices of other sales of subject merchandise

during the POR. Underlying this sales price inquiry is the idea that a respondent might arrange

for a high sales price in order to avoid the imposition of a significant antidumping duty margin.[2]

*Jinxiang Chengda Imp. & Exp. Co. v. United States*, 37 CIT __, __, Slip Op. 13-40, at 4–5 (Mar.

25, 2013).

Commerce's "totality of the circumstances" methodology has been found reasonable by

this Court. *See, e.g.*, *Shandong Chenhe*, 34 CIT at __, Slip Op. 10-129, at 6; *Catfish Farmers*, 33

CIT at __, 641 F. Supp. 2d at 1368 ("In determining whether a sale is a bona fide commercial

transaction, the Department examines the totality of the circumstances of the sale in question.");

*Allied Tube & Conduit Corp. v. United States*, 32 CIT 363, 364 n.1, 556 F. Supp. 2d 1350, 1351

n.1 (2008); *Allied Tube & Conduit Corp. v. United States*, 31 CIT 1090, 1092 (2007); *Hebei New*

*Donghua*, 29 CIT at 609, 374 F. Supp. 2d at 1338 ("Commerce's use of a 'totality of the

circumstances' bona fide sale test in new shipper reviews constitutes a permissible construction

of the statute.").

---

[2] An antidumping duty margin is "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise." 19 U.S.C. § 1677(35)(A). In other words, "[i]f the price of an item in the home market (normal value) is higher than the price for the same item in the United States (export price), the dumping margin comparison produces a positive number, indicating that dumping has occurred." *Qingdao Sea-Line Trading Co., Ltd. v. United States*, 36 CIT __, __, Slip Op. 12-00039, at 5 n.3. (Mar. 21, 2012). Therefore, if a respondent is able to enter its merchandise at a high sales price, the difference between the sales price and the price in the home market will be low, resulting in a low dumping margin.

**II.      The Department's Determination That Huachao's Sales Price Was Unusually [[      ]] Was Supported by Substantial Evidence**

*A.  Huachao's Sales Price Rank & Deviation from the Average Unit Value*

Commerce began its analysis of Huachao's sale by examining the company's sales price to its unaffiliated U.S. importer because an "analysis of the new shipper sales price is particularly important in a review where[, as here,] a company's margin [is] based on a single sale.  If the Department determines that the price was not based on normal commercial considerations or is atypical of the respondent's future sales, the sale may be considered not <u>bona</u> <u>fide</u>."  Bona Fides Mem. at 4.  To this end, Commerce placed on the record U.S. Customs and Border Protection ("Customs") data containing all entries of merchandise exported to the United States from the PRC during the POR under U.S. Harmonized Tariff Schedule ("HTSUS") category 0703.20.0010 for "Garlic, Fresh Whole Bulbs."  Def.'s Mem. 4.

The Customs data yielded an average unit value ("AUV") of [[      ]] per kilogram and average quantity of [[      ]] kilograms for all [[      ]] entries under this HTSUS heading.  Def.'s Mem. 4.  The Department then compared Huachao's sales price to its U.S. importer of [[      ]] to this AUV and found that the company's sales price was unusually [[      ]] because it was [[      ]] higher than the AUV.  Bona Fides Mem. at 9; Bona Fides Mem. at 4 ("Huachao's sale price of [[      ]] [per kilogram] ranks [[                 ]] [POR] entries under [the] HTSUS [heading].").  Furthermore, when one sale for another new shipper whose sale was found not to be bona fide was factored out, Huachao's sales price became the [[

      ]] POR sale of whole garlic.  Bona Fides Mem. at 4.  Therefore, the Department found that the comparison "supports a finding that Huachao's price is atypical" and that its sale was not bona fide.  Def.'s Mem. 18.

For plaintiff, however, "the rank among POR entities of a particular sales price, or the mere deviation of that sale price from the AUV, [is] meaningless without additional context." Pl.'s Br. 16.  Specifically, plaintiff insists that "Commerce relied upon the ranking of [Huachao's] sale price among POR sales and variance from the AUV without considering the full context of commercial practices of other Chinese fresh garlic exporters."  Pl.'s Br. 16. According to plaintiff, this "context" is revealed by a disaggregation of the Customs data and, in particular, a closer examination of the top 295 sales out of the [[        ]] entries of fresh, whole garlic during the POR.  Although it provides no reason why examining only the top 295 sales is superior to examining all entries, Huachao suggests five ways that Commerce should have analyzed this subset of the Customs data that would have illustrated the commercial reasonableness of the company's sale.

[[

| Rank | Price | # of Sales | Rank | Price | # of Sales |
|------|-------|------------|------|-------|------------|
|      |       |            |      |       |            |
|      |       |            |      |       |            |
|      |       |            |      |       |            |
|      |       |            |      |       |            |
|      |       |            |      |       |            |
|      |       |            |      |       |            |
|      |       |            |      |       |            |
|      |       |            |      |       |            |
|      |       |            |      |       |            |
|      |       |            |      |       |            |
|      |       |            |      |       |            |

]]

*This table displays the top 295 sales prices for entries of fresh, whole garlic exported from the PRC during the POR under HTSUS category 0703.20.0010.  The highlighted entry is Huachao's sale.  Modified from Pl.'s Br. 18.*

First, plaintiff argues that Commerce should have looked more closely at the top five highest-priced entries of whole garlic.  In particular, plaintiff contends that "Commerce did not explain that the [[                                    ]] POR sale(s) of whole garlic was [[

]] than the price of Huachao's sale."  Pl.'s Br. 17.  Furthermore, plaintiff

notes, "the next [[                                        ]] POR sale(s) of whole garlic were [[

          ]], or [[                                        ]] than the price of Huachao's sale."

Pl.'s Br. 17.  Thus, according to Huachao, had Commerce looked more carefully at the top five

sales out of the [[                ]], it would have been evident that "Huachao's price is not the

[[        ]] priced sale."  Pl.'s Br. 23.  Furthermore, plaintiff notes, the "[[                        ]]

between Huachao's sale and the [[                        ]] are the [[                                ]]

among POR entries."  Pl.'s Br. 17.

 Second, plaintiff insists that Commerce should have looked at the subsequent sales

ranked just below Huachao's sale in the Customs dataset because the Department

> did not explain that subsequent sales in the rankings [[
>          ]].  Specifically, in contrast to the [[
>      ]] Huachao's sale, there are [[          ]] within
> [[        ]] after Huachao's sale price of [[                        ]], (including
> [[      ]] sales at prices [[                    ]] Huachao's sale price).

Pl.'s Br. 17.  Thus, according to plaintiff, "[i]n stark contrast to the [[                    ]] difference

among the top [[    ]] sales, a mere [[        ]] separates sales ranked [[                ]],

representing [[      ]] total sales."  Pl.'s Br. 17.  Therefore, had Commerce looked more carefully

at the sales prices below Huachao's, it would have been evident that "Huachao's price . . . is

close to the price [[                                        ]]."  Pl.'s Br. 23.

 Third, Huachao asserts that Commerce should have compared plaintiff's sales price to the

various prices of the largest exporter (by volume) of whole garlic both for the month of

plaintiff's sale, [[                    ]], as well as for the entire POR.[3]  For plaintiff, if the

Department had done so, it would have been apparent that "Huachao's [[                ]] entry

---

[3]   While arguing for a comparison between Huachao's price and the prices of the sales of the largest exporter, the company also notes that Huachao and its U.S. importer "are not [[                                                ]] and a [[                        ]]."  Pl.'s Reply Br. in Supp. of 56.2 Mot. 12 (ECF Dkt. No. 75) ("Pl.'s Reply").

was only [[      ]] higher than the average price of the largest exporter's [[

[[      ]]." Pl.'s Br. 7.  Furthermore, in terms of the largest exporter's POR-wide prices,

Huachao points out that its sales price "was [[      ]] than [[      ]] of that exporter['s] POR

sales."  Pl.'s Br. 7.  For this reason, plaintiff insists that "[i]f Huachao's sale is evaluated for

commercial reasonableness, surely Commerce must take into account, and consider

commercially reasonable, the prices of [[      ]] exporter during the POR of whole garlic

bulbs."  Pl.'s Br. 24.  In other words, "Commerce cannot call prices 'commercially

unreasonable' or 'atypical' when there is [[      ]] of garlic that is sold, on

average, [[      ]], and also includes sales [[

[[      ]]."  Pl.'s Br. 24.

Fourth, plaintiff faults Commerce for ignoring price increases that it claims occurred

during the month of Huachao's sale, and argues that Huachao's price should have been

compared to the AUV for the month of its sale, rather than to the period-wide AUV.  For

plaintiff, "monthly AUVs demonstrate that the price of whole bulb garlic [[      ]] over the

POR, from [[      ]] per [kilogram] in November 2008, to a [[      ]] per [kilogram] in

February 2009, to a [[      ]] per [kilogram] in October 2009."  Pl.'s Br. 19.  Because

Huachao made its sale at [[      ]] per kilogram in October, it attributes its high sales price, in

part, to these market forces and therefore suggests disaggregation of the Customs data by month.

Once again referring to the largest exporter, Huachao also states that "[t]ellingly, here the

[[      ]]—whose nearly [[      ]] of

garlic accounted for more than [[      ]]—was only [[

[[      ]] Huachao's AUV for [[      ]] of garlic in [[      ]]."  Pl.'s

Reply Br. in Supp. of 56.2 Mot. 9 (ECF Dkt. No. 75) ("Pl.'s Reply") (emphasis omitted).

Fifth, plaintiff argues that "[t]o obtain data that reflects the commercial reality for companies that are able to sustain a presence in the U.S. market, Commerce should remove from [the Customs data] the entries of companies subject to AFA rates, China-Wide rates, and other high percentage rates." Pl.'s Br. 20–21 (listing [[         ]] exporters that plaintiff claims should have been excluded from the Customs dataset for purposes of the bona fides analysis and stating that "[i]t is beyond cavil that such companies cannot operate for any significant period of time in the U.S. market because high dumping duties will drive off potential buyers—thus, their prices are atypical, and more than that, they are unrepresentative and extremely distortive"). Furthermore, "[t]hese [[     ]] exporters account for [[               ]] POR entries of subject merchandise at a POR AUV of [[       ]]. Removing these entries results in an AUV of [[       ]] which is [[                ]] the all-inclusive POR AUV." Pl.'s Br. 22. Apparently plaintiff's argument is that, in order to remain in the U.S. market, producers and exporters with high dumping margins will sell their products at a discount from the market price, but because they cannot sell at these low prices indefinitely, they should be excluded from the AUV as atypical.

In response, Commerce counters that Huachao did not raise its arguments about disaggregating the Customs data before the Department, thereby failing to exhaust its administrative remedies. In addition, the Department claims that plaintiff's "arguments are barred by the doctrine of judicial estoppel" because the company argued earlier in the proceeding that the data should not be disaggregated. Def.'s Mem. 20.

As noted, in its November 12, 2010 Preliminary Results, Commerce initially found that Huachao's sale *was* bona fide and set the company's dumping margin at $0.03 per kilogram. Prelim. Results, 75 Fed. Reg. at 69,417, 69,422. The Department also noted that it "plan[ned] to continue to examine all factors relating to the <u>bona fide</u> nature of [Huachao's] sale throughout

the remainder of this [new shipper review]." Prelim. Bona Fides Mem. at 6.  Accordingly, on

January 27, 2011, the Department issued to plaintiff a supplemental questionnaire aimed at the

issue of whether Huachao's sale was bona fide, to which the company submitted a response on

February 14, 2011.  On February 18, 2011, the Department then issued a briefing schedule for

submissions addressing the bona fides of Huachao's sale.  On February 25, 2011, defendant-

intervenors filed a case brief disputing the Department's preliminary decision that Huachao's

sale was bona fide, and arguing for a finding that Huachao's sale was not bona fide.[4]  On March

7, 2011, Huachao submitted a rebuttal brief in response to defendant-intervenors' February 25,

2011 case brief.  Pl.'s Bona Fide Rebuttal Br. (Mar. 7, 2011) (C.R. 53) ("Pl.'s Rebuttal Br.").

Based on these briefs, the Department then issued its Rescission on April 7, 2011.

Although defendant claims that plaintiff should have raised its arguments related to the

use of the Customs data in the administrative proceeding below, it is evident that plaintiff had no

real opportunity to do so.  This is because plaintiff was not afforded an opportunity, subsequent

---

[4]        More specifically, on February 24 and 25, 2011, defendant-intervenors submitted a rebuttal to Huachao's February 14, 2011 supplemental questionnaire response as well as a case brief disputing the Department's preliminary decision finding Huachao's sale bona fide.  On March 3, 2011, Huachao submitted a letter asking that the Department reject both defendant-intervenors' February 24, 2011 submission, on the grounds that it contained untimely new factual information, and defendant-intervenors' case brief because it relied upon information contained in the February 24, 2011 submission.  The information at issue involved the nature of the United States garlic market and the appropriate benchmark to be used to determine the bona fide nature of Huachao's sale.  The Department found this information to be relevant to the information provided by Huachao in its supplemental response and therefore concluded that defendant-intervenors' submission was timely rebuttal information.

On March 7, 2011, Huachao then submitted a rebuttal brief in response to defendant-intervenors' February 25, 2011 brief.  In its brief, Huachao argued against Commerce's decision to allow defendant-intervenors to raise arguments regarding the [[            ]] of Huachao's entry.  In particular, Huachao argues that to make its [[            ]] argument, defendant-intervenors placed untimely new information on the record under the guise of a timely submission of rebuttal information to Huachao's February 14, 2011 supplemental questionnaire response.  Therefore, Huachao argued that Commerce should reject defendant-intervenor's arguments due to their speculative nature and reliance on untimely new factual information.  Bona Fides Mem. 3.  The Department then issued its Rescission on April 7, 2011.

to the issuance of the Rescission, to comment on any findings in the Rescission, in which the Department found, for the first time, that plaintiff's sales price was [[            ]], based on a comparison to the Customs data, and was therefore indicative of a non-bona fide sale. Thus, plaintiff could not have raised arguments relating to the disaggregation of the Customs data in response to Commerce's conclusions based on the AUV before the Rescission was issued because those conclusions were not made until the Rescission itself.

Therefore, plaintiff is correct in arguing that "Huachao did not have an opportunity before the agency to address Commerce['s] non-*bona fide* determination, which was made for the first time in Commerce's final determination." Pl.'s Reply 5. Accordingly, Huachao "was not required to raise this issue before the Department to exhaust administrative remedies because the Department's determination . . . changed between the Preliminary Determination and the Final Determination." *Shantou Red Garden Foodstuff Co. v. United States*, 36 CIT __, __, 815 F. Supp. 2d 1311, 1334 (2012); *see also Qingdao Taifa Grp. Co. v. United States*, 33 CIT __, __, 637 F. Supp. 2d 1231, 1236 (2009) (citing *LTV Steel Co. v. United States*, 21 CIT 838, 868–69, 985 F. Supp. 95, 120 (1997) ("A party . . . may seek judicial review of an issue that it did not raise in a case brief if Commerce did not address the issue until its final decision, because in such a circumstance the party would not have had a full and fair opportunity to raise the issue at the administrative level."). Thus, the court finds that plaintiff did not fail to exhaust its administrative remedies. *Globe Metallurgical Inc. v. United States*, 35 CIT __, __, 781 F. Supp. 2d 1340, 1357 (2011) (finding that respondents did not have an opportunity to review and challenge one of Commerce's determinations and therefore "application of the exhaustion doctrine would not be appropriate").

As to its judicial estoppel argument, defendant asserts that in Huachao's Rebuttal Brief in Response to the Preliminary Results, the company argued against disaggregating the Customs

data and "*supported* Commerce's preliminary use of the AUV and price rank as benchmarks from the complete [Customs] Entry Data for comparison of its sales price." Def.'s Mem. 20–21. That is, in its Rebuttal Brief Huachao stated that there is "no record evidence supporting a dissection of th[e] [Customs] data" and the company "agrees with [Commerce's] refusal to go behind the [Customs] data in its analysis." Pl.'s Rebuttal Br. 5. Therefore, the Department argues, "[g]iven its rebuttal brief argument, and Commerce's subsequent use of the average AUV and AUV price ranks from the [Customs] Entry Data as a whole despite [defendant-intervenors'] arguments to the contrary, Huachao should be prevented from making its new conflicting argument before the Court in the first instance." Def.'s Mem. 21.

The court finds that plaintiff is not judicially estopped from making its disaggregation argument here. "'[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.'" *Thai Plastic Bags Indus. Co. v. United States*, 34 CIT __, __, 752 F. Supp. 2d 1316, 1326 (2010) (quoting *New Hampshire v. Maine,* 532 U.S. 742, 749 (2001)). To be judicially estopped from raising an argument, however, "a party's later position must be 'clearly inconsistent' with its earlier position." *New Hampshire,* 532 U.S. at 750 (citations omitted).

Here, it not clear that plaintiff's arguments before this court are inconsistent with its arguments opposing disaggregation in its rebuttal brief because, as noted above, its rebuttal brief was made in support of Commerce's preliminary determination that Huachao's sale *was* bona fide, and its later arguments are not "clearly inconsistent" with those made earlier. That is, in the Rebuttal Brief, plaintiff was specifically contesting defendant-intervenors' suggestion that [[                                                                                                ]] were

misclassified (because they actually represented peeled garlic or some other specialty product) and therefore these [[    ]] entries should be removed from the Customs data. Pl.'s Rebuttal Br. 3. If the Department were to do so, defendant-intervenors argued, then Huachao's sales price would become the highest in the dataset. Pl.'s Rebuttal Br. 4.

To this argument plaintiff responded that, "[w]hile there may well be inaccuracies in the [Customs] data, the [defendant-intervenors] can point to no record evidence supporting a dissection of those data such that product specifications [(i.e., peeled garlic or specialty merchandise)] and size can be identified. There is simply nothing to back up [defendant-intervenors'] claim that certain entries . . . were misclassified." Pl.'s Rebuttal Br. 5. Hence, plaintiff's arguments below and those made here are not "clearly inconsistent." That is, an argument that certain entries should be removed from the data because they were misclassified is hardly at odds with an argument that the data should be grouped differently for analysis. Thus, it is evident that plaintiff cannot be judicially estopped from raising its disaggregation arguments before the court.

With regard to Huachao's substantive arguments, Commerce insists that "[e]ven if the Court excuses the doctrines of exhaustion and judicial estoppel, Huachao's arguments to disaggregate the [Customs] Entry Data have no merit." Def.'s Mem. 21. In particular, the Department's position is that its comparison between plaintiff's price and the AUV is superior to plaintiff's assertion that Huachao's sales price should be compared to the five subsets it suggests. Def.'s Mem. 19.

As a starting point, defendant argues that "[t]his Court has affirmed Commerce's use of complete sets of AUVs from [Customs] data to serve as a benchmark in a *bona fides* analysis, because 'using [the average of] a large sample is a better indicator of normal activity than a comparison of a smaller number of selected sales.'" Def.'s Mem. 21 (quoting *Shandong Chenhe*,

34 CIT at __, Slip Op. 10-129, at 17) (citing *Tianjin Tiancheng*, 29 CIT at 267, 366 F. Supp. 2d at 1256 ("Larger sample sizes are generally preferable when the goal is, as here, to generalize from a sample to a population, because the larger the sample, the less risk run that the sample chosen is extreme or unusual simply by chance.")). Thus, for the Department, a comparison between Huachao's price and the AUV is a better indication of whether Huachao's sale was commercially reasonable because a comparison to the average of [[        ]] data points is more probative than a comparison to a smaller subset of this dataset.

As to plaintiff's suggestion that its price should be compared to the top five highest prices, Commerce responds that "the simple fact that Huachao's price is closer to another price in the [Customs] Entry Data than it is to the average proves nothing," particularly since there are [[                  ]] in this dataset. Def.'s Mem. 22. Furthermore, "[a]n examination of the [Customs] Entry Data demonstrates that there [was] a significant number of sales with a wide range of prices within the data" and therefore a comparison of five "cherry-picked" prices is not a fair "apples-to-apples" comparison. Def.'s Mem. 22.

Plaintiff's suggestion regarding an examination of the sales ranked just below Huachao's price meets with similar disapproval. The Department notes that "Huachao's sales price of [[      ]] is still [[                     ]] than the segmented benchmarks it proposes." Def.'s Mem. 23. Indeed, while plaintiff points out that "there are . . . [[     ]] sales at prices [[                  ]] Huachao's sale price," Pl.'s Br. 18, it is clear that [[     ]] of these sales were made at [[        ]], or [[    ]] less than Huachao's sales price. Furthermore, these sales constitute only [[    ]] sales out of a total of [[        ]] entries, and therefore are not as probative of commercially reasonable sales as is the AUV. Def.'s Mem. 22 ("[T]he . . . fact that Huachao's price is closer to another price in the [Customs] Entry Data than it is to the average proves

nothing."). Hence, Commerce asserts that a comparison with the prices ranked below Huachao's does not support plaintiff's position.

Along the same lines, for the Department, a comparison with the largest exporter's prices, as plaintiff requests, also does not help the company because that "exporter's [AUV] for the [POR] is [[          ]]" in comparison to Huachao's sales price of [[          ]]. Def.'s Mem. 23. In other words, even were the Department to limit its analysis to a comparison with other highly-priced entries, or to the largest Chinese exporter's prices, the company's sales price is still unusually high by comparison.

Similarly, a comparison with the monthly AUV, instead of the POR-wide AUV, does not assist Huachao, according to defendant. This is because "the AUV for October, the month Huachao made its [[          ]] sale, is [[          ]]; indeed, the remaining months during the [POR] also have [[          ]] AUVs than Huachao's sale price." Def.'s Mem. 23. Put another way, even had the Department compared Huachao's sales price only to the AUV for the month of Huachao's entry, the company's price would still have been found to be unusually high.

Finally, the Department also found that "removing the China-wide and adverse facts available rate companies as Huachao proposes, results in an AUV of only [[          ]]." Def.'s Mem. 23. At [[          ]], Huachao's price is still well above that AUV, even removing the entries Huachao has identified as problematic. Therefore, Commerce maintains that this last comparison is equally unhelpful to the company. Thus, although the Department insists that it need not disaggregate the data as part of its totality of the circumstances analysis, it further asserts that the comparisons favored by plaintiff do not aid its case.

While not worded in precisely the same way, plaintiff's arguments echo those previously made to this Court that examining data by ranging is more useful than using an AUV. *See, e.g., Jinxiang Chengda*, 37 CIT at __, Slip Op. 13-40, at 10 (rejecting plaintiff's argument that its

sales price should have been compared to a "range of prices in order to show that Chengda's transfer sales price was close to at least some similarly-priced entries of peeled garlic, although it was much higher than the AUV"). Thus, respondents in earlier cases have urged that looking at only a portion of a dataset can yield a clearer view of the evidence than an average of the entire set. *See, e.g.*, *id.* at __, Slip Op. 13-40, at 10–11. While it may be that this kind of analysis can yield useful information, the court agrees with defendant that the AUV from the Customs data can also be a useful tool for comparison because it provides a fair representation of prices set by the market overall. *See U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1363 (Fed. Cir. 1996) ("Computing an average is arguably the most basic of all statistical techniques. It permits compression of large quantities of data into a single representative figure capable of easy comprehension and assimilation. In that respect, it is undoubtedly a valuable tool."); *see also Shandong Chenhe*, 34 CIT at __, Slip Op. 10-129 at 19–20 ("[U]sing the average of a large sample is a better indicator of normal activity than a comparison of a smaller number of selected sales."); *Tianjin Tiancheng*, 29 CIT at 267, 366 F. Supp. 2d at 1256 ("[T]he larger the sample, the less risk run that the sample chosen is extreme or unusual simply by chance.") (citation omitted). Here, using the larger sample, the Department demonstrated that plaintiff's sales price of [[        ]] was unusually [[      ]] because it was [[          ]] higher than the AUV of [[       ]]. Bona Fides Mem. at 9.

As to plaintiff's arguments that the Customs data should be disaggregated, defendant has adequately demonstrated that a comparison between segments of the Customs' data and plaintiff's import price would not only be a less useful comparison than the POR-price average in its bona fide analysis, but also that such comparisons only highlight the commercial unreasonableness of Huachao's price.

Initially, it is worth noting that plaintiff has failed to provide an adequate explanation for selecting its proposed subset of entered values. Nonetheless, plaintiff is, in fact, correct that a close examination of (1) the top five sales in the data and (2) the sales ranked immediately below Huachao's price shows that there is a division that occurs in the top twenty-two price ranks: the prices for ranks [[         ]] are clearly much [[         ]] than the other figures, while the prices for ranks [[         ]] are more closely clustered around approximately [[         ]]. Pl.'s Br. 18. There were, however, [[              ]] during the POR, and therefore Huachao's relative place close to the top of the 295 highest-priced sales (i.e., those ranked from 1 to 22 in the table above) merely demonstrates that Huachao's price is an outlier even among the highest-priced sales. Therefore, this comparison tends to confirm that it was reasonable for Commerce to compare Huachao's price to the average from the entire dataset to determine whether the company "conducted bona fide or commercially reasonable transactions." *Shandong Chenhe*, 34 CIT at __, Slip Op. 10-129, at 5.

Next, Commerce was not required to limit its analysis to a comparison between Huachao's price and the prices of the largest exporter by volume during the POR. While a comparison relying on a range of prices can be a valuable tool for Commerce, plaintiff has failed to provide any argument as to why its sale should be compared to those of the largest exporter. As plaintiff itself acknowledges, "Huachao and its U.S. importer . . . are not [[

                    ]] and a [[                         ]]." Pl.'s Reply 12. Moreover, while plaintiff is correct that its price "was [[         ]] than [[         ]] of that exporter['s] POR sales," Huachao's sales price of [[         ]] was still substantially higher than the largest exporter's average of [[         ]]. Pl.'s Br. 7; Def.'s Mem. 23. Therefore, because Huachao has not provided an adequate explanation as to why a comparison to the sales of the largest exporter

yields useful information, and the comparison does not favor plaintiff in any event, it was reasonable for Commerce to reject the comparison.

Finally, plaintiff's claim that the Department should have compared its price to the AUV for the month of [[                    ]], instead of the AUV for the POR, or should have removed prices for exporters subject to AFA rates, China-wide rates, and other high percentage rates from the dataset before calculating the AUV fail for a similar reason. Had plaintiff been able to demonstrate that prices in October 2009 were markedly different than those during the remainder of the POR, its proposed comparison might have proven useful. Huachao, though, has only shown that the AUV was somewhat higher in October 2009 at [[         ]] as compared to [[          ]] in November 2008 at the beginning of the POR. This small price increase in October 2009, however, does not explain why plaintiff's price of [[          ]] was almost [[                    ]] than October's AUV. Def.'s Mem. 23. Therefore, Huachao's price would still have appeared to be abnormally high if only the October AUV were considered.

Plaintiff has also failed to support with record evidence its argument that sales from producers and exporters with high antidumping rates should be excluded from the dataset because these producers and exporters must sell at unsustainably low prices. Nor has it cited record evidence to support its related claim that companies subject to high dumping rates cannot operate in the U.S. market. Thus, the court is left with plaintiff's unsupported argument that "[i]t is beyond cavil that such companies cannot operate for any significant period of time in the U.S. market." Pl.'s Br. 20. The only record evidence relating to this issue, however, indicates that the majority of entries during the POR were made by companies with high antidumping margins, suggesting that it is possible for a producer or exporter with a high margin to participate in the U.S. market.

Also, as has been seen, this disaggregation would not help plaintiff.  Tellingly, removing the companies subject to China-wide and AFA rates, as Huachao proposes, results in an AUV of [[         ]] as compared to Huachao's sales price of [[           ]].  Def.'s Mem. 23.  As such, even had Commerce made the comparison plaintiff requests, it would have aided the defendant and not Huachao.

### B.  Bulb Size

As part of its analysis of Huachao's sales price, Commerce also examined the size of the company's garlic bulbs in relation to their price.  To this end, Commerce "requested that Huachao report its bulb size for purposes of selecting the appropriate surrogate value."  Bona Fides Mem. at 4.  For Commerce, this information is useful because "the Department has consistently relied upon APMC Azadpur price data from India in the calculation of surrogate values.  This price data is based on bulb grade which is determined by bulb size; as [[

]] increase, so do APMC Azadpur's prices."  Bona Fides Mem. at 9.

In its response, "Huachao reported that the whole garlic bulbs it sold were between [[

]] in size; this size being the [[                      ]] for whole garlic sold in the United States."  Bona Fides Mem. at 5.  Using this information, and relying "on the Department's historical acknowledgement of the direct relationship between garlic bulb price and size," Commerce concluded that "the relatively [[        ]] nature of the garlic Huachao sold would lead to the expectation of a [[       ]] sales price.  To the contrary, however, Huachao's sale price is very [[       ]] compared to [the] entry data."  Bona Fides Mem. at 5.  "Therefore, combined with already existing concerns about Huachao's sales price . . . , the relatively [[         ]] size of the garlic leads the Department to conclude that Huachao's sales price is not

indicative of a commercially reasonable, <u>bona fide</u> sale nor is the price predictive of likely future commercial activity." Bona Fides Mem. at 5.

To plaintiff, however, "Commerce's attempt to cast doubt on the *bona fide* nature of Huachao's sales price—with a brief discussion of [[            ]]—is based entirely upon speculation and completely ignores evidence [[                                    ]] supporting a [[                        ]] whole garlic bulb sales." Pl.'s Br. 26. Furthermore, plaintiff argues, "the agency record 'does not have data about the [[            ]] as it pertains to all [[                ]],' or even as it pertains to [[                ]]." Pl.'s Br. 27 (quoting Bona Fides Mem. at 4). Indeed, in making its bulb size argument, plaintiff asserts that "Commerce speculated that 'some portion of the [Customs] entries for whole garlic *must have been composed of* [[                            ]].' This speculation was the sole basis for Commerce's conclusion that . . . Huachao's 'sales price *must be deemed* [[      ]] than the price typically paid, as evidence[d] by the [Customs] data.'" Pl.'s Br. 26 (citations omitted).

In so concluding, according to plaintiff, "Commerce ignored record evidence providing support for the *bona fide* nature of Huachao's sale price. Specifically, in [[            ]] Huachao's importer [[                                ]], to which Huachao [[

                                                                ]].'" Pl.'s Br. 27. For plaintiff, this evidence unequivocally "support[s] a [[                        ]] whole garlic bulb sales, namely for [[                ]]." Pl.'s Br. 26.

In response, Commerce acknowledges that "the Department does not have data about the [[            ]] as it pertains to all [[                ]]." Bona Fides Mem. at 4. The defendant did, however, have record evidence about the size of Huachao's shipped garlic bulbs,

and therefore insists that because "Huachao shipped the [[                    ]] bulb of whole garlic

recognized in the American garlic industry," this "supported its finding that Huachao's price is

abnormally [[        ]]." Def.'s Mem. 23.  The Department defends this conclusion by noting that

it "has consistently relied upon the fact that there is a direct relationship between garlic bulb

price and size when calculating a margin under [the fresh garlic from the PRC antidumping]

order; the greater the size, the greater the price" as demonstrated by the APMC Azadpur pricing

data that was placed on the record.  Bona Fides Mem. at 4.  Therefore, the Department

concluded, "given the correspondence between price and size, the fact that Huachao shipped [[

                    ]] only increases the extent to which its sales price must be deemed [[        ]]

than the price typically paid, as evidenced by [Customs] data."  Bona Fides Mem. at 9.  In other

words, because Huachao's entry of whole garlic was comprised of the [[                       ]], the

unusually high sales price could not be justified by the size of the bulb.

Furthermore, Commerce asserts that "[t]o the extent Huachao otherwise argues that

[[                                          ]] specifically account for its price difference,

these arguments were not presented to Commerce in the first instance despite petitioners raising

[the [[            ]] issue] in their [post-Preliminary Results] case brief."  Def.'s Mem. 24.  Even

were the court to ignore plaintiff's failure to raise this argument before the agency, however, the

Department claims that "Huachao can point to no record evidence to substantiate its arguments

other than self-serving statements made by Huachao during [[                    ]] with its

customer."  Def.'s Mem. 24.

First, despite defendant's claim that plaintiff has failed to exhaust its remedies as to its

bulb size argument, the court finds that exhaustion is not required in this case for the reasons

discussed above.  In particular, plaintiff was not afforded an opportunity to comment on the

Department's findings regarding bulb size subsequent to the Rescission, where Commerce found

for the first time that plaintiff's [[                                        ]] supported its determination that Huachao's

sales price was [[                ]], and therefore indicative of a non-bona fide sale.  *See Globe*

*Metallurgical*, 35 CIT at __, 781 F. Supp. 2d at 1357 (finding that respondents did not an

opportunity to review and challenge one of Commerce's determinations and therefore

"application of the exhaustion doctrine would not be appropriate").

        As to the merits of plaintiff's arguments, the court finds that the Department was

reasonable in considering Huachao's bulb size in its totality of the circumstances analysis,

although the Department's conclusions outrun the facts.  *Tianjin Tiancheng*, 29 CIT at 260, 366

F. Supp. 2d at 1250 ("[B]ecause the ultimate goal of the new shipper review is to ensure that the

U.S. price side of the antidumping calculation is based on a realistic figure, any factor which

indicates that the sale under consideration is not likely to be typical of those which the producer

will make in the future is relevant.").  While, standing alone, the size of Huachao's garlic bulbs,

the [[                    ]] in the American garlic industry, would not provide substantial evidence to

support Commerce's determination that Huachao's price was unusually high, the Department's

bulb size analysis tends to lend some additional support to its price analysis based on the AUV

from the Customs data.

        As noted, although the Department can point to record evidence to support the notion that

Indian domestic prices vary directly with bulb size, Commerce put no evidence on the record to

establish this conclusion with respect to U.S. imports from China.  Thus, it was not reasonable

for Commerce to conclude that, simply because of the [[        ]] size of the bulbs, Huachao's

sales price was not indicative of a commercially reasonable sale.  It was reasonable, however, for

Commerce to use record evidence of Huachao's [[                        ]] and record evidence of the

relationship between bulb size and price (i.e., the APMC Azadpur pricing data) to discount any

claim that Huachao might make that the size of its garlic bulb justified its high price.  Further,

plaintiff's argument that its garlic is more valuable, and therefore commanded a higher sales

price, because of its "potency" and "growing region" is not supported by any record evidence

other than a brief self-serving email exchange purportedly between Huachao and the U.S.

importer, and, as such, is not persuasive.[5]  Therefore, Commerce's bulb size analysis adds some

weight to the conclusion found in the bona fides memorandum that Huachao's sales price was

unusually high, and plaintiff's arguments do not detract from the evidence upon which the

memorandum is based.

> C. *Commerce's Finding That Huachao's Sales Price Was So High As to Be Commercially Unreasonable and Not Indicative of the Garlic Industry Was Supported by Substantial Evidence*

For all of the foregoing reasons, Commerce's determination that Huachao's sales price

was abnormally high, and therefore indicative of a non-bona fide sale, was reasonable and

supported by substantial evidence because (1) the Department properly compared Huachao's

sales price to the AUV in the Customs data and found that the company's price was abnormally

---

[5]     This email exchange, the sole support offered by plaintiff regarding the value of its garlic due to its [[                                        ]], was as follows.  The unaffiliated U.S. importer wrote:

> [[
>
>
>                  ]].

To this message, Huachao responded:

> [[
>
>
>                  ]].

Pl.'s Br. 4.

high; (2) Commerce was not required to limit its comparison between Huachao's price and the

Customs data to a disaggregated subset of the Customs data (i.e., to the top five sales, to the sales

ranked just below Huachao's price, to the monthly AUV for the month of the company's entry,

or to the AUV with prices for companies subject to AFA rates, PRC-wide, and other high

percentage rates removed) as urged by plaintiff because the AUV for the total dataset was a

better indicator of commercial activity; (3) the Department demonstrated that even had it

compared Huachao's sales price to the disaggregated subsets of the Customs data, these

comparisons would not have justified the high price; and (4) Commerce's consideration of the

size of Huachao's garlic bulb in relation to its sales price lent some support to its finding that

Huachao's price was abnormally high, and Huachao's arguments as to the potency of its garlic

were not supported by probative record evidence.

**III.     The Department's Determination That Huachao's Sales Quantity Was Abnormally Low Was Supported by Substantial Evidence**

The second part of Commerce's bona fide analysis involved an examination of the

volume of Huachao's sale to the unaffiliated U.S. importer.  In particular, Commerce "compared

Huachao's sales volume to the average of all other entries of whole garlic during the period of

review contained in the [Customs] Entry Data."  Def.'s Mem. 25.  In doing so, Commerce found

that, "in relation to the quantity of other entities of subject merchandise during the POR,"

Huachao's sales quantity of [[                              ]] was low.  Bona Fides Mem. at 5.  Therefore,

the Department "continue[d] to identify the sales quantity as indicative of a non-bona fide sale."

Bona Fides Mem. at 5.  Specifically, Commerce found that "the average quantity for [fresh

whole garlic] entries was [[          ]] kilograms, while Huachao's quantity was [[             ]]

kilograms, ranking in the [[      ]] percentile ([[                                            ]]) and

only [[     ]] of the average POR exported quantity."  Bona Fides Mem. at 5.  While Commerce

acknowledged that "the Department would not normally rely on quantity alone to determine whether a new shipper sale was bona fide, and it has not done so in this case," it found that Huachao's low quantity was yet another indication that the company's sale was not bona fide. Bona Fides Mem. at 10.

According to plaintiff, however, "Commerce failed to acknowledge the commercial context of Huachao's sale and refused to further analyze [Customs] data on the record, . . . both of which demonstrate that Huachao's sale was not . . . 'atypical.'" Pl.'s Br. 28. In terms of commercial context, plaintiff first offers the argument that "[[

]]. Huachao's sale—nearly [[

]] which is commonly used in international trade and, as the [Customs] data demonstrate, is commonly used in the sale of garlic.'" Pl.'s Br. 28–29 (citations omitted). Therefore, while acknowledging that "Huachao's sales volume indeed is [[     ]] of the average POR exported quantity," plaintiff argues that "this volume corresponds almost perfectly with the volume requiring [[

]], with the POR average [[                                        ]]." Pl.'s Br. 29. To support its assertions, plaintiff cites only to its own rebuttal case brief.

Commerce found Huachao's argument unpersuasive, observing that "conspicuously absent from these statements are citations to *any* record evidence, other than to Huachao's own rebuttal brief (which also lacks such citations), regarding the quantity contained in [[

]] containers or the frequency in which [[          ]] containers are used for garlic bulb sales." Def.'s Mem. 26. Indeed, the record indicates that Huachao's entry of [[

]] was much less than the average quantity of [[          ]] kilograms, but no evidence regarding shipment quantity and container size is on the record to support plaintiff's claimed correlation. Def.' Mem. 26.

Second, plaintiff argues that "Huachao's sale is [[

]]. This is not a [[          ]] quantity by any measure. Commerce's determination to the

contrary is undermined by the fact that there are [[                    ]] shipments, and a total of

[[                      ]] shipments are below [[                        ]]." Pl.'s Br. 29 (citations

omitted). Furthermore, "[t]he list of exporters shipping these [[              ]] sales almost

exclusively includes [[                   ]] POR shippers." Pl.'s Br. 30.

Defendant finds this argument equally unpersuasive, stating that "[a] simple absolute

statement that there were [[                    ]] shipments does nothing to support Huachao's

analysis. Nor does the fact that [[                          ]] of the [Customs] entries have

quantities below [[         ]] kilograms 'undermine' Commerce's conclusion as to quantity",

especially since Huachao's shipment was not [[                   ]], rather it was [[

]]. Def.'s Mem. 27. Indeed, "Huachao's calculations result in an incomplete

comparison and ignore the fact that the vast majority of shipments made by these exporters

involve much [[       ]] quantities, sometimes [[       ]] that of Huachao's single sale, with

AUVs far [[     ]] than Huachao's sale price. Huachao's cherry-picking of entries does not

render Commerce's determination unsupported by substantial evidence." Def.'s Mem. 28

(citations omitted).

In addition, the Department reiterates "that [this court] has repeatedly held that

disaggregation of the data is not required and that 'using a large sample is a better indicator of

normal activity than a comparison of smaller number of selected sales.'" Bona Fides Mem. at 10

(citing *Shandong Chenhe*, 34 CIT at __, Slip Op. 10-129, at 17; *Tianjin Tiancheng*, 29 CIT at

260, 366 F. Supp. 2d at 1256). Therefore, "the Department has continued to rely upon the

average quantity data, calculated from [Customs] data, for whole garlic entries during the POR

as the benchmark for evaluating the normal commercial quantity." Bona Fides Mem. at 10.

Hence, "with respect to Huachao's argument that the Department should compare the quantity of Huachao's sale with other entries that are similar in quantity, the Department will not disaggregate the [Customs] data."  Bona Fides Mem. at 10.  As noted, however, even if it were to do so, a simple finding "that there were [[                              ]] shipments does nothing to support Huachao's analysis" as there were a total of [[                      ]] during the POR.  Def.'s Mem. 27.

Third, plaintiff insists that "Commerce has determined more than once that a 'small quantity test sale is not necessarily contrary to normal business considerations,' especially given the fact that the subject merchandise is subject to a high all-others rate."  Pl.'s Br. 31 (citations omitted).  Indeed, "[u]nder the circumstances of this case, where the China-wide rate is 376.67% or \$4.71 per [kilogram], a sale with a [[      ]] quantity cannot be called commercially unreasonable, atypical, or unrepresentative and highly distortive."  Pl.'s Br. 31.

In response, Commerce relies on *Hebei* for the proposition that "invocation of the term 'test sale' does not have a talismanic effect, negating all indications of an atypical transaction." *Hebei New Donghua*, 29 CIT at 610, 374 F. Supp. 2d at 1344.  Furthermore, "[w]hen a purported test sale is under review, Commerce is not obligated to overlook evidence suggesting that the U.S. sale 'was made solely for the purpose of establishing a new antidumping deposit rate, without regard to the commercial reasonableness of the sale.'"  *Id.* (citation omitted).  Indeed, Commerce contends that here, as in *Hebei*, it does "not have 'verifiable indications' of the *bona fides* of Huachao's sale, even assuming it constituted a test sale.  Huachao 'made a single sale and then requested the new shipper review' . . . . Thus, the simple fact that Huachao's sale may or may not have been a test sale does not detract from Commerce's determination as to quantity."  Def.'s Mem. 27 (quoting *Hebei New Donghua*, 29 CIT at 610, 374 F. Supp. 2d at 1343).

Finally, plaintiff asserts that evidence placed on the record by Huachao also "demonstrates that the quantity of . . . Huachao's U.S. sale was well within the range of its domestic sales [i.e., those in the PRC] during the relevant period." Pl.'s Br. 31. To support this claim, plaintiff provided evidence regarding [[          ]] domestic sales it made as a garlic trader, as distinct from a garlic producer and exporter, in the PRC to demonstrate that [[      ]] of these sales were smaller than the size of its export sale here.

Commerce found, however, that plaintiff only "list[ed] three of its domestic sales" to support this assertion. Def.'s Mem. 28. "However, [[                              ]] of Huachao's domestic sales had a quantity [[                    ]] that of Huachao's sale at issue here. The next [[          ]] sale quantities of [[                  ]] kilograms are [[

]] Huachao's export sale." Def.'s Mem. 28 (citation omitted). Furthermore, the Department found "that a comparison of Huachao's domestic sales quantities is not appropriate in this review, the best quantity benchmark continuing to be the U.S. [Customs] data for whole garlic" because "the average quantity data, calculated from [Customs] data for whole garlic entries during the POR [is the best] benchmark for evaluating the normal commercial quantity" for exports into the United States. Bona Fides Mem. at 10. Thus, for the Department, a comparison with the quantities of other sales of whole garlic into the United States is more probative of commercial reasonableness than the quantities of Huachao's home market sales when acting as a trader. Bona Fides Mem. at 10.

The court agrees with defendant that Huachao's arguments regarding the volume of its sale are unpersuasive. First, plaintiff's argument regarding the size of shipping containers is unsupported by any record evidence. Thus, because container sizes are not part of the Customs data, there is no evidence on the record to support a claim that there is a relationship between the volume of garlic per entry and the shipping container size. Nor, for that matter, is it clear to the

court that the "entirely filled a 20-foot container" argument has any probative value.  That is,

even if there were record evidence to support the claim that Huachao shipped a full 20-foot

container, what matters here is the relationship of plaintiff's shipment size to the norm, not

whether the shipment bears a relationship to a standard container.  *See Jinxiang Chengda*, 37

CIT at __, Slip Op. 13-40, at 30.

Equally unpersuasive is plaintiff's argument regarding the [[     ]] smaller volume sales.

This argument simply highlights how far removed plaintiff's shipment quantity was from the

average.  Thus, it adds little weight to plaintiff's claim that its sale was commercially reasonable

because [[    ]] out of [[        ]] sales were smaller than the company's sale.  Further,

Huachao's assertion that its shipped quantity of [[                                              ]] "is not a

[[        ]] quantity by any measure" is not relevant to whether this quantity is reflective of a

commercially reasonable sale.

As to plaintiff's contention that a small quantity might be indicative of a "test case", the

court "is aware that the size of an entry does not necessarily control Commerce's analysis."

*Shandong Chenhe*, 34 CIT at __, Slip Op. 10-129, at 14.  Nonetheless, a sale's size "can raise

questions as to whether the purchaser would buy the merchandise in the future in the same

quantity at the same price."  *Id.*; *see also Tianjin Tiancheng*, 29 CIT at 260, 366 F. Supp. 2d at

1250 ("[B]ecause the ultimate goal of the new shipper review is to ensure that the U.S. price side

of the antidumping calculation is based on a realistic figure, any factor which indicates that the

sale under consideration is not likely to be typical of those which the producer will make in the

future is relevant.").  Thus, the size of the entry, while not controlling, can play a role in the

"totality of the circumstances" analysis.

Although plaintiff argues that "'single sales, even those involving small quantities, are

not inherently commercially unreasonable and do not necessarily involve selling practices

atypical of the parties' normal selling practices,'" as defendant points out, plaintiff must do more than simply claim that it made a small test sale. Pl.'s Br. 31 (quoting *Windmill*, 26 CIT at 228, 193 F. Supp. 2d at 1310). This is particularly the case when there are other "indications of an atypical transaction." *Hebei New Donghua*, 29 CIT at 616, 374 F. Supp. 2d at 1344. Rather, there must be "verifiable indications" of the bona fides of a sale. *Id.* Here, there were no indications that Huachao's sale was otherwise bona fide as the Department reasonably determined that Huachao's sales price was unusually high. In other words, standing alone, the low quantity of Huachao's sale would not have established that it was a non-bona fide sale, but, under the totality of the circumstances, the low quantity is yet another indication of a non-bona fide sale.

Finally, the Department properly rejected Huachao's argument regarding the volumes of the company's domestic sales in the PRC. First, it is difficult to see how Huachao's domestic sales, where it acted as a garlic trader in China, are relevant when considering a sale into the U.S. where it acted as a garlic producer and exporter. Comparison of sales where the company acted in a different role in its home market would not appear to be probative, particularly where the sales are in a non-market economy country and there is no evidence they were made under market conditions. Furthermore, even were the Department to limit its analysis to a comparison of Huachao's own domestic sales and its export quantity, Huachao's claim that its export quantity was in line with its domestic quantities is entirely unsupported by the record evidence. Indeed, as defendant points out, "[[                                    ]] of Huachao's domestic sales had a quantity [[                    ]] that of Huachao's sale at issue here." Def.'s Mem. 28.

For these reasons, the court finds that Commerce reasonably concluded that Huachao's sales quantity was low because (1) plaintiff's claim regarding shipping container sizes was entirely unsupported by record evidence; (2) plaintiff's unsupported statement that its shipment

quantity, while being the [[        ]] smallest quantity out of [[        ]] entries, was a large amount

of garlic, and therefore must have been bona fide, did not negate the shipment's comparatively

small size; (3) plaintiff's claim that its small shipment quantity could be indicative of a test sale,

and therefore was not inherently non-bona fide, was unavailing in light of the absence of other

"verifiable indications" of a bona fide sale; and (4) plaintiff's suggestion that its export quantity

was in line with its domestic sales quantities when acting as a garlic trader was not a useful

comparison, and in any event did not aid plaintiff's case.

**IV.    The Department's Determination That the Nature of Huachao's Transaction Was Atypical Was Supported by Substantial Evidence**

The next part of Commerce's bona fide analysis was an examination of the transaction

between Huachao and its U.S. importer to determine "whether or not Huachao's transaction is

indicative of typical business practices and future commercial behavior." Bona Feds Mem. at 6.

"In its request for a new shipper review, Huachao certified that it was both the exporter and

producer of its new shipper sale." Bona Feds Mem. at 6. During the bona fide analysis,

however, Commerce found it problematic that Huachao did not normally process garlic for its

domestic sales. Rather, prior to its sole sale as a producer and exporter, Huachao was simply a

trader of processed garlic, and "has no permanent processing facility or processing workers."

Bona Fides Mem. at 6. Specifically, Huachao informed the Department that

> it has traditionally been a domestic garlic trader and . . . does not normally process garlic for its domestic sales and did not process garlic subsequent to the sale under review. Because Huachao required space for processing and packing, as well as additional employees to conduct this work, it rented out temporary space at a garlic farm and hired temporary workers for purposes of processing and packing the garlic under review.[6]

---

[6]     Specifically, "[f]or the purposes of its United States sale, Huachao purchased fresh garlic from an unaffiliated [[                    ]] and [[
                                                    ]]. Huachao hired temporary workers to process and pack the garlic." Def.'s Mem. 30 (citing Bona Fides Mem. 6).

Bona Fides Mem. at 6 (citation omitted). This acknowledgement led to Commerce's finding "that [Huachao's] operation and structure is not normal for a company planning to export garlic to the United States on a regular basis." Def.'s Mem. 30 (citing Bona Fides Mem. at 6). Thus, the Department concluded that "Huachao's function as the processor of its U.S. sale is atypical of its normal business practice." Rescission, 76 Fed. Reg. at 19,324.

In response, Huachao insists that "Commerce points to no record evidence, no case law, no prior agency practice, or any industry commentary to support its determination. Instead, Commerce muses about how Commerce believes Huachao's business model is unworkable and will have to change in the future." Pl.'s Br. 32. In doing so, according to plaintiff, "Commerce ignores Huachao's ability to choose its own business model, and this Court's prior decisions about Huachao's current business model." Pl.'s Br. 32–33. In support of this argument, Huachao claims that its business model is similar to tolling arrangements[7] that both Commerce and this Court have found to be legitimate business enterprises. Pl.'s Br. 33 ("Commerce ignored earlier pronouncements that similar 'tolling arrangement[s] are often part of a legitimate business enterprise.'" (quoting *Catfish Farmers*, 33 CIT at __, 641 F. Supp. 2d at 1368)).[8]

---

[7]     "Tolling arrangements" are contracts between raw material companies and processors or manufacturers wherein a raw material or intermediate product from one company is delivered to the production facility of another company in exchange for the equivalent volume of finished products and payment of a processing fee. *See Atar, S.r.L. v. United States*, 35 CIT __, Slip Op. 11-00087, at 2 (July 22, 2011). Thus, under a tolling arrangement, an exporter would not need processing or manufacturing capabilities as it would rely on another company for those services. Here, however, there was no evidence that Huachao entered into such an arrangement with any company. Rather, Huachao purchased garlic, [[                ]], and hired [[                    ]].

[8]     *Catfish Farmers* involved an antidumping administrative review for frozen fish fillets from the Socialist Republic of Vietnam. There, the court sustained Commerce's "reasonable finding" that an exporter's "tolling arrangement did not, on its face, suggest an illegitimate commercial enterprise because tolling arrangements are often part of legitimate business enterprises." *Catfish Farmers*, 33 CIT at __, 641 F. Supp. 2d at 1369.

Defendant points out, however, that "[w]hile Huachao is not required to be an established processor to be eligible for a separate antidumping duty margin, for its sale to be considered bona fide, Huachao must show that its sale is indicative of typical business practices and future commercial behavior." Bona Fides Mem. at 6. For Commerce, "[t]he fact that Huachao has no processing space or employees to do the processing indicates that the structure of its new shipper sale cannot be indicative of future commercial behavior." Bona Fides Mem. at 6. This because "[i]t is hardly normal business practice for a company to rely upon temporary facilities and employees if it plans on exporting garlic to the United States on a regular basis. Instead, Huachao would require more permanent processing facilities and human resources, changes that would have a significant effect on the company's operations, costs, and structure." Bona Fides Mem. at 6. Therefore, "[t]he fact that Huachao will have to alter its business operations as it converts itself from a garlic trader to a garlic processor limits the current sale's usefulness in predicting future commercial behavior on the part of Huachao." Bona Fides Mem. at 6.

As to plaintiff's characterization of its transaction as a "tolling arrangement," Commerce found that "neither Huachao's contract with its supplier nor its contract with its customer are similar to tolling arrangements, nor is there any evidence on the record to support such a claim." Def.'s Mem. 31. To the contrary, "[t]he record provides no evidence that these contracts constituted anything other than Huachao's simple, one-time purchase of raw garlic from an unaffiliated supplier, and Huachao's simple, one-time sale of garlic to an unaffiliated importer." Def.'s Mem. 31. In other words, Commerce claims that there is no record evidence that Huachao's exported merchandise was processed or produced by another company pursuant to an agreement whereby Huachao delivered unprocessed garlic to a processor together with a payment and received in exchange processed garlic. Huachao purchased the garlic and then acted as both the processor and the exporter for its U.S. sale, and therefore the transaction was

not similar to a tolling arrangement. As such, Commerce insists that substantial record evidence

supports its determination that Huachao's unusual business model was not indicative of a typical

export sale.

The court finds that Commerce's conclusions about Huachao's lack of an infrastructure

provide some evidence of a non-bona fide sale because it is unknown whether Huachao will be

able to duplicate the conditions of its first garlic export (i.e., the temporary [[

                    ]] with a [[                    ]] and [[                                        ]]) in order to arrive

at a similar sales price in the future. While Huachao may be able to reproduce *similar* processing

arrangements in the future [[

                                                ]], it is not clear that future arrangements could be made at

the same cost to the company. Therefore, the sales price under review may not be a good

indicator of future sales prices. In other words, it is evident that the conditions that produced

Huachao's sales price were not indicative of the company's regular business activities and may

not be reliable indicators "of future commercial behavior." *Hebei New Donghua*, 29 CIT at 613,

374 F. Supp. 2d at 1342.

As with the factors discussed earlier, were the nature of this transaction the sole portion

of Huachao's sale considered by Commerce, it would not provide sufficient evidence that

Huachao's sale was not commercially reasonable. "Commerce, however, has the authority to

consider a variety of factors in determining whether a transaction is commercially reasonable."

*Jinxiang Chengda*, 37 CIT at __, Slip Op. 13-40, at 34 (citing *Hebei New Donghua*, 29 CIT at

616–17, 374 F. Supp. 2d at 1343–44; *Windmill*, 26 CIT at 231–32, 193 F. Supp. 2d at 1313–

1314). In order to prevent an exporter from unfairly benefitting from an atypical sale to obtain a

low dumping margin, Commerce may review any relevant evidence that suggests that a U.S. sale

was commercially unreasonable or atypical of future business practice. *See Tianjin Tiancheng*,

29 CIT at 260, 366 F. Supp. 2d at 1250.  Therefore, while the nature of Huachao's transaction,

on its own, would not be sufficient to find the company's sale to be non-bona fide, when

combined with the unusually high price and abnormally low quantity of its sale, the nature of the

transaction tends to support Commerce's conclusion that the transaction was atypical of

Huachao's normal business practices.  Thus, the peculiar circumstances presented here could be

considered by Commerce in its totality of the circumstances analysis.  That is, it was reasonable

for Commerce to find that the facts surrounding Huachao's transaction would be unlikely to be

repeated in the future.


**V.      The Department's Determination That the Structure of Huachao's Sale Was Atypical Was Supported by Substantial Evidence**

The final part of Commerce's bona fide analysis included an examination of "the cash

flow and timeline surrounding the payment by Huachao's [U.S.] customer."  Def.'s Mem. 32.

To this end,

> the Department requested additional factual information from Huachao's
> customer, . . . including all 'financial documents that demonstrate all transactions
> related to the purchase, import and sale of the subject merchandise' as well as
> 'bank statements' . . . to: (1) obtain greater detail about the cash flow and timeline
> surrounding the [customer's] payments [for] the merchandise, antidumping duty,
> ocean freight, and other costs surrounding the transaction; and (2) to perform
> additional analysis related to the transactions involved in the sale.

Bona Fides Mem. at 6–7.  In response, Huachao's U.S. customer "provided the Department with

. . . copies of its purchase ledgers . . . [in which it] record[ed] the month, day, and year and

below, notes the products purchased and the price it paid."  Bona Fides Mem. at 7.  For

Huachao's entry, however, Commerce found that the customer "did not note the date but rather

just the month and year; it was the only entry with this discrepancy."  Bona Fides Mem. at 7.

Additionally, the Department found that "while the purchase appears in September 2009,

the purchase price . . . listed in the purchase ledger was not, in fact, the price paid by [the

unaffiliated U.S. importer] to Huachao for the garlic . . . , but rather the exact amount for which [the importer] reportedly sold the garlic to its customer[] in December 2009." Bona Fides Mem. at 7. In other words, Huachao's unaffiliated U.S. importer erroneously entered its own sales price (i.e., the price at which the importer sold the garlic to its customer) on its purchase ledger, rather than the price it paid Huachao for the garlic.

In addition to the irregularities in the purchase ledger, the Department did not receive all of the information it asked for. In particular, "[a]lthough Commerce requested the importer['s] bank statements covering the period August 1, 2009 through December 31, 2009, the importer could provide [[          ]] bank statement for the month of December 2009; the importer stated that it could not access the remaining statements because they were '[[

]].'" Def.'s Mem. 6 (citation omitted). In the absence of this information "the Department was unable to consider that information for purposes of corroborating the information provided by Huachao itself. [For example,] the missing bank information prevents the Department from checking how [the importer] paid the antidumping duty cash deposit[9] and other aspects of the sales terms between the parties." Bona Fides Mem. at 7. Based on these facts, Commerce

---

[9] The manner in which the cash deposit is paid is important because it plays a role in how the Department calculates dumping margins. Under Commerce's regulations, prior to liquidation importers must certify to Customs whether an exporter or producer has agreed to pay or reimburse the antidumping duties. 19 C.F.R. § 351.402(f)(2) (2009). If an importer fails to file such a certificate, Commerce may presume that the exporter or producer has paid or reimbursed those duties. Id. § 351.402(f)(3). If so, Commerce will then reduce the export price by the amount that the exporter or producer has paid or reimbursed the importer. Id. § 351.402(f)(1)(i). See Nereida Trading Co., Inc. v. United States, 34 CIT __, __, 683 F. Supp. 2d 1348, 1352 n.3 (2010); All Tools, Inc. v. United States, 34 CIT __,__, Slip Op. 10-114, at 3 (2010) (citing 19 C.F.R. § 351.402(f)(1)-(3) (2010)) ("The purpose of a non-reimbursement statement is to assure Customs that the importer will not be repaid the antidumping duty by the exporter or producer of the merchandise. If an importer fails to file a non-reimbursement statement, Commerce may presume that the exporter or purchaser did, in fact, reimburse the importer for the antidumping duties paid. In cases where Commerce relies on this presumption, it will treat the duty as if it had been fully reimbursed, and will charge the importer the duty a second time, in effect doubling the duty rate.").

concluded that "there are inconsistencies in the information provided by Huachao's customer in the United States, raising doubts about Huachao's description of the sale's structure." Rescission, 76 Fed. Reg. at 19,324.

To plaintiff, "Commerce's discussion of Huachao's unaffiliated importer reveals that Commerce drew inferences adverse to Huachao based upon the acts of its unaffiliated importer." Pl.'s Br. 35. In doing so, according to plaintiff, Commerce "did not explain how one alleged inconsistency [(i.e., the improperly recorded date in the purchase ledger)] was material, inferred the most adverse conclusion from the alleged second inconsistency [(i.e., the entry of the sale price in the purchase ledger)], and overlooked record evidence that fully explains the alleged third inconsistency [(i.e., the inability of the U.S. customer to provide its bank statements)]." Pl.'s Br. 3. Finally, plaintiff argues, "the acts of an unaffiliated importer cannot—as a matter of law—result in an *adverse inference*[10] against Huachao, and thus Commerce's concerns about the importer are insufficient to support its *bona fides* determination." Pl.'s Br. 34 (emphasis added).

In response, Commerce asserts that "Huachao's argument that Commerce should not have considered the actions of its U.S. customer is unfounded. Despite Huachao's contentions, Commerce did not apply 'adverse inferences' to Huachao, pursuant to 19 U.S.C. § 1677e, for the importer's 'failure to cooperate.'" Def.'s Mem. 36. To the contrary, "Commerce's conclusions do not result from the application of adverse inferences, but constitute statements of fact

---

[10] It is unclear why plaintiff discusses "adverse inferences" in the context of a new shipper review. "Adverse inferences" are used in the context of antidumping investigations and periodic reviews if Commerce finds that a respondent has "failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b). In that case, the Department "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available" in order to calculate an antidumping duty rate. *Id.* As such, adverse inferences may play a role in the determination of an antidumping margin, but are not part of the bona fide sales analysis framework.

regarding the evidence on the record." Def.'s Mem. 36. Moreover, according to defendant, "this Court has affirmed Commerce's examination of [a] customer's behavior and commercial transactions in its *bona fides* analysis." Def.'s Mem. 36 (citing *Hebei New Donghua*, 29 CIT at 616–17, 374 F. Supp. 2d at 1343–44). Hence, "Commerce's analysis of the record evidence to substantiate a plaintiff's claims routinely includes [a consideration of the data] provided by the customer, which is impossible if the importer refuses to provide Commerce with requested information." Def.'s Mem. 36.

As to the particular evidence at issue, defendant supports its conclusions regarding the inconsistencies in the purchase ledger by noting that the Department has "more than 13 months of [the customer's] purchase ledger and only the entry pertaining to the purchase of Huachao's garlic does not include a day, as well as the month and year." Bona Fides Mem. at 14. In addition, Commerce points out that "it is a purchase ledger, but the entry does not reflect [the customer's] purchase price, but rather it exactly matches its sales price; sales prices would not be entered into a purchase ledger." Bona Fides Mem. at 14.

In terms of the missing bank statements, Huachao attempted to explain the unaffiliated importer's inability to produce the evidence by submitting a letter from the importer that stated "[[

]]". Bona Fides Mem. at 7 (citation omitted). According to Commerce, however, defendant-intervenors "presented factual evidence which indicates that [the bank] does in fact make available balances and transaction data for up to 24 statement periods."[11] Bona Fides Mem. at 7. For these reasons, the Department believes it properly considered the

---

[11]     As part of its February 24, 2011 submission of rebuttal factual information, defendant-intervenors included bank account information from plaintiff's U.S. customer's bank stating that "[b]alances and transaction data are available for up to 24 statement periods." Def.-Ints.' Submission of Rebuttal Factual Information Ex. 4 (C.R. 57).

information provided by Huachao's customer in finding that there were doubts about the nature of the transaction and the sale's structure.  Def.'s Mem. 37.

The court finds that the inconsistencies in Huachao's U.S. customer's responses to Commerce's questionnaires, and its failure to provide all of the information the Department requested, lends additional support to Commerce's finding of a non-bona fide sale under the "totality of the circumstances" test.  Once more, were the deficiencies in Huachao's U.S. customer's responses the sole portion of the transaction considered, they would not provide sufficient evidence that plaintiff's sale was not commercially reasonable.  Thus, the court does not believe that the inconsistencies in the questionnaire responses coupled with the missing bank statements, standing alone, are sufficient evidence to support a finding that Huachao's sale was not bona fide.  As discussed, however, the Department has the authority to examine a variety of factors in determining whether a transaction is commercially reasonable.  *Jinxiang Chengda*, 37 CIT at __, Slip Op. 13-40, at 34.  Thus, the deficiencies in the responses and the missing information could be considered by Commerce in its totality of the circumstances analysis.  Further, based on the incorrect entries in the ledger and the U.S. customer's failure to produce bank statements that were apparently available to it, it was reasonable for Commerce to find that doubts were raised about plaintiff's description of the structure of the sale.

## CONCLUSION

In sum, using its totality of the circumstances analysis, Commerce supported with substantial evidence its determination that Huachao's sale was not commercially reasonable, and therefore not bona fide.  As part of its determination, the Department reasonably found that (1) Huachao's sales price was abnormally [[          ]]; (2) Commerce was not required to limit its comparison of Huachao's price and the Customs data to a disaggregated subset of the data; (3)

Huachao's garlic bulb size was an indication that Huachao's unusually [[      ]] sales price

could not be justified based on bulb size; (4) Huachao's sales quantity was [[      ]]; (5) the

circumstances surrounding Huachao's transaction were unlikely to be repeated in the future; and

(6) the inconsistencies and deficiencies in the records Commerce received from Huachao's

customer were indicative of a non-bona fide sale.  In light of these reasonable findings,

Commerce's Rescission of Huachao's new shipper review was supported by substantial evidence

and was in accordance with law.

   Therefore, based on the foregoing, plaintiff's Motion for Judgment on the Agency Record

is denied and the Department of Commerce's final determination rescinding plaintiff's new

shipper review is sustained.

                 /s/ Richard K. Eaton

                 Richard K. Eaton

Dated:  May 14, 2013
    New York, New York